NO. 4-06-0439     Filed 6/11/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Marriage of | ) | Appeal from the |
| ROBIN C. MANKER, | ) | Circuit Court of |
|     Petitioner-Appellee | ) | Morgan County |
|     and Cross-Appellant, | ) | No. 03D152 |
|     and | ) | |
| PATRICIA J. MANKER, | ) | Honorable |
|     Respondent-Appellant | ) | James W. Day, |
|     and Cross-Appellee. | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

In March 2006, the trial court dissolved the marriage of petitioner, Robin Manker, and respondent, Patricia Manker. Patricia appeals, arguing error in the trial court's decision (1) to retain jurisdiction on the allocation of petitioner's Teachers' Retirement System (TRS) pension until Patricia's TRS pension is in pay status and (2) that Robin's automated teller machine (ATM) withdrawals of funds from the marital checking and savings account after the couple's separation were not dissipation of marital funds. Robin cross-appeals, arguing that (1) the trial court erred in its treatment of attorney fees as dissipation of marital assets and (2) the maintenance award must be modified if this court reverses on the issue of the trial court's reservation of jurisdiction over the pensions. We affirm in part, reverse in part, vacate in part, and remand with directions.

# I. BACKGROUND

Robin and Patricia were married on June 5, 1971. Their first son, Brad, was born in 1979. Their second son, Tyson, was born in 1982. In February 1992, Robin began a relationship with Karen Isom. That relationship lasted three months. On July 28, 2002, Robin moved out of the marital home. After Robin moved out, he lived with his parents for three months. Robin testified that he paid his parents $500 per month in rent. In 2003, Robin began dating Isom again. On August 18, 2003, Robin filed a petition for dissolution of marriage.

On December 7, 2004, Patricia filed a motion for temporary relief stating that she was paying the mortgage and all other household expenses. The motion requested that Robin's benefit payments from TRS be divided equally so that Patricia would receive $1,781.29 per month.

Also on December 7, 2004, Patricia filed a motion requesting a preliminary injunction and reimbursement of assets to the marital estate. The motion alleged that Robin had been using marital funds to make rent payments to Isom. The motion specifically referenced a $4,000 check written by Robin to Isom, which was allegedly for 10 months' rent at the rate of $400 per month. The motion also cited various expenditures made by Robin from marital funds for improvements on Isom's home.

The motion requested that the trial court enter a

- 2 -

preliminary injunction prohibiting Robin from paying marital funds to Isom, or to any other individual or entity on her behalf, throughout the course of the dissolution proceedings. The motion requested the court enter an order for Robin to reimburse the marital estate for the cost of the rent paid to Isom and the cost of the improvements on her home. The motion also requested Robin reimburse the estate for the cost of labor expended in improving her home.

On January 31, 2005, the trial court entered an order reflecting that the parties had stipulated that (1) Robin would pay Patricia, as a marital property adjustment, $750 per month retroactive to June 2, 2004, and continuing until the court ordered otherwise; (2) Robin will not expend marital funds for gifts to Isom; (3) Robin would cease any further cash payments to Isom; (4) Robin would cease expending funds toward the repair, upkeep, or improvement of Isom's residence or other property of Isom's during the pendency of the dissolution proceedings; (5) any expenses Robin contributes to Isom's household must be reasonable; (6) reimbursement by Robin of amounts paid to Isom, including the $4,000 in rent, will be reserved until further order of the court; (7) Robin will pay Patricia $1,250, representing half of the $2,500 expenditures Robin expended to improve Isom's home; and (8) Patricia agreed to return 14 enumerated items of personal property to Robin that were in her

possession at the time.

The trial court held a hearing on April 1, 2005. Robin testified that he currently resided with his girlfriend, Isom. He and Isom began living together in October 2003. Robin retired on June 2, 2004. Robin testified that prior to the trial court's order issued January 31, 2005, he had been paying Isom $400 per month in rent which he paid in one lump sum in June 2004 in the amount of $4,000 for 10 months' rent. After the court's order of June 2, 2004, Robin agreed not to make any further rent payments to Isom. Robin said he came to the $400 amount for rent by comparing prices of apartments in the local paper.

Robin testified that after he moved out, Patricia was concerned about being able to pay her bills. Robin offered to pay the remainder of the loan balance left on her car. The payment was $500 per month, and Robin testified he made payments until the loan was paid in full on Patricia's car.

Patricia testified that she was currently employed as an elementary school teacher at Washington School in School District 117 in Jacksonville. She had worked for the past eight years at District 117 and for five years from 1974 through 1979 (at the end of 1979 she took maternity leave and then resigned).

Patricia testified that she currently had a total of 13 years of service at District 117 and that she had been given some credit for years she spent substitute teaching in the district.

Patricia testified she was buying back credit for the time she spent on maternity leave. She was purchasing the maximum amount of credit she could, three years, for $12,000 plus $3,900 in interest for a total of $15,900. Patricia testified that her total years of service after buying the 3-year credit will be 16 years.

James K. Hagerman, a certified public accountant with Kerber, Eck, and Braeckel, testified that he specialized in the area of tax investments and financial planning. He testified for respondent; however, it was Patricia's attorney who originally asked him to render his opinion on the valuation of each party's TRS pensions.

He testified that in calculating the projected value of Patricia's pension, he assumed a retirement age of 60. On June 30, 2004, the time Hagerman made his valuation of Patricia's pension, Patricia had accumulated 13.78 years of service credit. In 1998, Patricia applied for an annuity benefit that would increase the return rate on her investment in her TRS benefit plan. She had been making payments to purchase the improved return rate since 1998.

Hagerman explained that, to project a value for Patricia's pension, he started with the monthly annuity, then based on the retirement date (which for Patricia would be March 2009 based on a retirement age of 60) he would "run a stream of

- 5 -

payments" from the retirement date until the end of the life-expectancy factor. In this case, Hagerman said that it consisted of a series of monthly payments of $1,005.15. Hagerman said he took this stream and used an interest rate to "bring that number back into today's dollars, which is the present value." The reason for this is that the number is not a sum of the projected monthly annuity, but instead it is based upon an assumed interest rate. Hagerman said that another way of explaining the process was that it is the amount of dollars it would take today invested over the period of her life expectancy to earn interest at an assumed rate that would result in the total sum, including principal and interest, to make that series of monthly payments.

Hagerman testified that he did not take into account any survivor benefit when calculating the projected value of Patricia's pension. Hagerman agreed that if there were an additional benefit for a surviving spouse included in Patricia's pension, it would increase substantially in value. Hagerman also acknowledged that there were other options to increase the pension, which included buying back time taken on maternity leave or while substitute teaching.

Hagerman said that the assumed 5.3% interest rate he used in his calculation was based on a 30-year treasury rate as of June 30, 2004. Hagerman said that he believed that this long-term rate was the appropriate rate to use for the period of

Patricia's life expectancy.  Robin entered Hagerman's estimate of the present net value of Patricia's pension as of June 30, 2004, as respondent's exhibit No. 1.  In that document, Hagerman calculated the net value of Patricia's pension to be $161,199.  Hagerman considered this to be the marital portion of her annuity since it was confined to the time Patricia worked as a teacher during her marriage to Robin.  Hagerman also explained that, should Patricia die before the estimated life-expectancy date, she would not realize the full value of her annuity.  Also, if she were to live past that date, she would realize more than the projected value.

Hagerman then testified that joint exhibit No. 7 was a notice of first payment by TRS to Robin.  This document indicated that Robin's gross monthly benefit was $3,562.58.  Hagerman testified that Robin's pension was in pay status, which meant the amount represented on the exhibit was the actual amount he receives, not an estimate.

Hagerman said that after January 1, 2010, the monthly gross amount of Robin's pension would increase to $4,159.38.  Hagerman was unsure why Robin's pension would not increase every year by 3% like Patricia's would, but that TRS's information did not grant Robin's first 3% increase until 2010.  However, after 2010, Robin's would also increase 3% annually.  Hagerman's personal calculation of Robin's pension was entered as

respondent's exhibit No. 3.  Hagerman used the exact same computations to gain a present value of Robin's pension as he did to attain the value of Patricia's.  The only difference was that Robin's life expectancy was estimated to be four years shorter than Patricia's.  Hagerman testified that this would affect the present value of the pensions such that if a portion of Patricia's were to be assigned to Robin, it would actually be worth less because of his shorter life expectancy.

Hagerman also testified that the TRS estimate of Robin's pension on June 30, 2003, before he retired, was considerably less than what he actually received upon retirement. The estimate at that time was $3,086.54, when he actually received $3,562.58.  Hagerman testified that Patricia's pension would also increase due to added years of service and salary increases after June 30, 2004.  Hagerman then testified to respondent's exhibit No. 12.  Robin's attorney explained that exhibit No. 12 was a demonstrative exhibit to show what the historical increases in salary have been and projecting them forward at the same percentage through 2009, Patricia's expected retirement date.  Patricia's attorney objected, stating that Patricia's contract expired in 2005 and any increases in salary were speculative.  In the new estimate, Hagerman applied a service credit of 18.468 years.  The result was an estimate of $1,344.57 for the marital portion of Patricia's pension.

On July 21, 2004, the trial court issued its memorandum of decision.  The court found that Robin's $4,000 check to Isom for rent was a legitimate living expense and did not constitute dissipation of marital assets.  The court found that Patricia had failed to present a prima facie case for dissipation regarding the ATM withdrawals and the withdrawals from the savings account made by Robin during the couple's separation.  The court believed Robin's testimony that these withdrawals were used for regular living expenses.  However, the court did find that Robin had dissipated marital assets in the form of gifts to Isom, Isom's use of Robin's gas card, Robin's brother's use of Robin's gas card, and trips with Isom to Colorado, Atlanta, Indianapolis, and Kansas City.  Including the costs of meals and hotels, the court found Robin owed $2,374.05 to the marital estate.  Regarding the trips, the trial court found that half the expenses incurred on the trips were dissipation since Robin was going to visit his family and it could be inferred he would have made these trips regardless but Isom would not.

The trial court divided the assets as follows:

|  | Patricia | Robin |
| --- | --- | --- |
| 160 East Pennsylvania Ave. | $86,000.00 | |
| Mortgage | (23,439.25) | |
| 2000 Pontiac Bonneville | 7,700.00 | |
| 1996 S-10 Truck | | $3,800.00 |

| | | |
|---|---:|---:|
| Tractor | | 2,400.00 |
| Tax-sheltered annuity (Robin) | | 57,197.38 |
| Tax-sheltered annuity (Patricia) | 1,842.33 | |
| JSB-checking (Patricia) | 0 | |
| JSB-savings (Patricia) | 370.79 | |
| JSB-checking (Robin) | | 5,230.85 |
| JSB-savings (Robin) | | 1,767.83 |
| Personal property | 5,562.00 | 215.00 |
| 14 Northvale | | 875.00 |
| Camera | | 350.00 |
| Miscellaneous tools | | 100.00 |
| Air compressor | | 250.00 |
| Computer software | | 354.95 |
| TOTAL | $78,035.87 | $74,915.06 |

The trial court reserved jurisdiction on both Robin's and Patricia's TRS pensions.  The court stated that it intended to divide the pensions upon Patricia's retirement using the formula articulated by the court in In re Marriage of Wisniewski, 286 Ill. App. 3d 236, 675 N.E.2d 1362 (1997).

The order stated:

"[Patricia's] TRS plan will be divided by a Qualified Illinois Domestic Relations Order [(QILDRO)] in accordance with the proportionality rule propounded in Marriage

- 10 -

of Wisniewski, 286 Ill. App. 3d 236, 243, 675 N.E.2d 1362, 1368, (1997), requiring payment of 50% of the marital portion of the then current and all future benefits, including post[]dissolution increases, to [Robin].  The marital portion of her plan shall be determined by multiplying the benefit by a fraction, the numerator of which shall be the number of whole months from the date of the marriage of the parties through the date of this [o]rder and the denominator of which shall be the number of whole months from the date of the marriage of the parties through the commencement of pay status of her plan."
(Emphasis added.)

Pending Patricia's retirement, the trial court ordered Robin to pay Patricia $1,000 per month in maintenance.  The court found that the attorney fees of each party were approximately the same and, in conformance with its intention to divide the marital property 50-50, ordered the parties to pay their own attorney fees.

On August 18, 2005, Patricia filed a motion for reconsideration alleging that the trial court erred in retaining jurisdiction over the parties' pensions.  Patricia argued that

the court failed to state findings as to why immediate allocation of both pensions was inappropriate. Patricia argued that by not allocating Robin's pension, the court left undetermined how the payments Robin received between July 2004 and Patricia's retirement would be treated. Patricia argued that while Robin was given the opportunity to invest and create wealth with the current payments, she was deprived of this opportunity. Patricia argued that half of Robin's monthly pension payment should be allocated to her retroactive to July 2004 and, upon her retirement, half of her pension be allocated to Robin less the percentage of the pension attributable to Patricia's nonmarital effort.

On March 13, 2006, the trial court entered an amended judgment of dissolution of marriage. The court's order, in addition to the earlier findings in its memorandum decision that remained unchanged, ordered Robin to pay Patricia $12,117.73 to equitably divide the paid and unpaid attorney fees. The court found that the attorney fees already paid by both parties constituted dissipation of marital assets and that the unpaid fees were marital debt.

With respect to the TRS pensions, the trial court found (1) both plans were fully vested and entirely marital property; (2) Patricia's pension is not in pay status and "significant actuarial uncertainties" set forth in the record make

- 12 -

determination of present value for her plan "speculative and uncertain"; (3) Robin's pension is in pay status and "significant actuarial uncertainties" set forth in the record make determination of a present value for his plan "speculative and uncertain"; (4) actuarial uncertainties preclude treating the plans as equivalents for the purpose of offsetting the value of one plan against the other; (5) there are insufficient marital assets to fully offset the value of Robin's plan to allow him to retain his entire plan; (6) there are insufficient marital assets to fully offset the value of Patricia's plan to allow her to retain her entire plan; and (7) reserving jurisdiction until Patricia's plan is in pay status will enable the court to equitably divide both plans.

With regard to both Patricia's and Robin's TRS plans, the court found, "The plan[s] [have] value only as a stream of future, monthly income payments, the amount and commencement of which is uncertain."

Robin filed a motion for modification of the court's allocation of attorney fees. On May 2, 2006, the trial court denied Robin's motion for modification in its entirety.

This appeal followed.

## II. ANALYSIS

### A. The Trial Court Erred in Reserving Jurisdiction Over Robin's TRS Pension

On appeal, Patricia argues that the trial court's

reservation of jurisdiction over Robin's matured and vested pension was an abuse of discretion. Patricia argues that not receiving her share of the funds from Robin's pension deprives her of the ability to invest her share of the pension and create wealth.

"This court will not reverse the trial court's choice of an apportionment method absent an abuse of discretion." Wisniewski, 286 Ill. App. 3d at 243, 675 N.E.2d at 1368. The trial court stated its intention was to divide the property equally between the parties. However, it reserved jurisdiction over the parties' pensions, which comprises a bulk of the marital assets. The court stated that it intended to reserve jurisdiction until the time of Patricia's retirement. However, Patricia's retirement date was uncertain. At the time of the hearing she was 56 years old and had no present plan to retire.

By reserving jurisdiction over both parties' pensions, the trial court created an undesirable situation in which this dissolution proceeding would linger for years before apportionment applied. See Wisniewski, 286 Ill. App. 3d at 243, 675 N.E.2d at 1367 ("Disputes such as this one should not be allowed to linger for over a decade"). "Finality, both to avoid future court intervention and to allow the parties to plan their futures with some certainty, is also a goal to be achieved by the allocation and division of property." In re Marriage of Moll,

- 14 -

232 Ill. App. 3d 746, 757, 597 N.E.2d 1230, 1237 (1992).

The reserved-jurisdiction approach was not appropriate in this case when Robin's pension had matured and was in pay status. In Wisniewski, 286 Ill. App. 3d at 241, 675 N.E.2d at 1366, this court held that when it is too difficult to assign a present value to the marital interest in the pension or when the "cash-out" approach is otherwise an impractical solution, the court may reserve jurisdiction. "Under such an approach, the court does not immediately compensate the nonpensioner spouse. Instead, it orders that the employee spouse pay the nonemployee spouse his or her portion of the marital share 'if, as, and when' the pension plan becomes mature." Wisniewski, 286 Ill. App. 3d at 241, 675 N.E.2d at 1366, quoting In re Marriage of Hunt, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979).

The reserved-jurisdiction approach should be used in "situations where the amount of the retirement benefits which will actually be paid out cannot be calculated with any certainty at the time of dissolution of the marriage." In re Marriage of Whiting, 179 Ill. App. 3d 187, 191, 534 N.E.2d 468, 471 (1989). The reason for reserving jurisdiction is to avoid speculation about the future stream of pension payments. Whiting, 179 Ill. App. 3d at 191, 534 N.E.2d at 471.

There is no question in this case if and when Robin's pension will mature. He was receiving, and continues to receive,

- 15 -

monthly pension payments.  Moreover, Robin cites no authority supporting his position that the trial court may properly reserve jurisdiction over his matured pension.

The trial court did provide for the method of apportionment of Robin's and Patricia's pensions.  The court would divide Robin's pension by the QILDRO requiring 50% of the then-current and future benefits, including postdissolution increases, to be paid to Patricia.  The court would also divide Patricia's pension by the QILDRO in accordance with the proportionality rule set forth in <u>Wisniewski</u>.  <u>Wisniewski</u>, 286 Ill. App. 3d at 240-43, 675 N.E.2d at 1366-68.  However, the fact that Patricia's pension had not yet matured did not prevent the court from being able to apply the formula to equitably divide Robin's pension.  The trial court heard expert testimony regarding the present value and projected future value of her pension.  The court could choose to offset that value now and perhaps modify the judgment if the pay out is larger or smaller than the expert's projections when Patricia's pension matures and goes into pay status.

Expert testimony established an approximate value of Patricia's plan.  Robin's plan was already in pay status and the value was known with only the inherent uncertainties of life expectancy in question.  The trial court concluded:

"[T]he actuarial uncertainties of valuing the

defined benefit TRS pension plans of the parties and given that different uncertainties apply to valuation of each plan, the [c]ourt finds it is not equitable or actuarially possible to treat the plans as equivalents for the purpose of offsetting the value of one plan against the other to effect a division of these two items of marital property."

The trial court's characterization of Robin's pension as "uncertain" is contrary to case law. "The value of the retirement benefits is determined simply by how much is actually paid out." Whiting, 179 Ill. App.3d at 191, 534 N.E.2d at 471; see also In re Marriage of Ramsey, 339 Ill. App. 3d 752, 760, 792 N.E.2d 337, 344 (2003) ("[a]lthough the reserved-jurisdiction method is not the only acceptable way to value a pension, when it is used, the amount divided is the amount actually received"). Since Robin's pension is being paid out, the value of the benefit is easily ascertainable. Robin's benefit is wholly marital too, which makes apportioning the value of the benefit even easier since the entire pension is marital property. The trial court seems to have assumed that it could not treat the pensions separately. However, by retaining jurisdiction over only Patricia's pension, the court does not deprive either party of

the marital portion of that benefit.  Patricia receives nothing from her pension now, nor does Robin.  Contrarily, Robin is receiving a benefit from his pension now and Patricia is receiving nothing.

The trial court could have also used the "cash-out" approach to determine the present value of the marital portion of Patricia's pension and offset that with marital property, thereby compensating Robin for awarding Patricia her entire benefit. Either approach would have been an equitable division of the assets by the trial court.

By reserving jurisdiction, however, the trial court has deprived Patricia of the time-value of her portion of Robin's pension.  In other words, Patricia does not have the ability to invest her portion of Robin's pension now in order to accumulate wealth for later.  In Wisniewski, the supreme court held that "Illinois law has long recognized the time value of money." Wisniewski, 286 Ill. App. 3d at 244, 675 N.E.2d at 1369. Granted, the issue in Wisniewski was whether the earlier marital contributions to a pension entitled the nonpensioner spouse to reap the benefits of the accrued interest in that money over time.  However, the principle is the same.  Patricia's present inability to invest her portion of Robin's pension works to her financial detriment.  Therefore, the trial court's failure to divide Robin's matured pension, which was in pay status and

continues to be in pay status, was an abuse of discretion.  On remand, we direct the trial court to divide Robin's pension according to the QILDRO.  Because Robin's pension is entirely marital, Patricia is entitled to 50% of the monthly payments.  Patricia should also receive her portion of the payments Robin received since the date of judgment, less the $1,000 maintenance award.

With regard to Patricia's pension, we affirm the reservation of jurisdiction over Patricia's plan, which is not yet in pay status.  We also affirm the trial court's order directing Patricia's pension to be allocated using the QILDRO and the formula used in <u>Wisniewski</u> to determine the marital portion of Patricia's pension belonging to Robin.  However, we note that the trial court erred in its description of the formula used in <u>Wisniewski</u>.  The order states:

> "[Patricia's] TRS plan will be divided by a
> [QILDRO] in accordance with the
> proportionality rule propounded in
> [Wisniewski] requiring payment of 50% of the
> marital portion of the then[-]current and all
> future benefits, including post[]dissolution
> increases, to [Robin].  The marital portion
> of her plan shall be determined by
> multiplying the benefit by a fraction, <u>the</u>

numerator of which shall be the number of whole months from the date of the marriage of the parties through the date of this [o]rder and the denominator of which shall be the number of whole months from the date of the marriage of the parties through the commencement of pay status of her plan."

(Emphasis added.)

However, the proportionality rule in Wisniewski takes the total monthly payout of the pension and determines the marital portion to be the number of years of marriage that the pensioner spouse participated in the plan as the numerator, and the total years of service as the denominator. The trial court then multiplies these two numbers to obtain the marital interest in each monthly payment. Finally, the court multiplies that number by .50 to obtain the nonpensioner spouse's share (before taxes). This is the formula that should be applied to determine Robin's portion of Patricia's monthly pension payments. Therefore, we reverse the trial court's description of the Wisniewski formula to the extent it varies from the actual formula enunciated in Wisniewski.

B. Trial Court's Conclusions on Dissipation of Marital Assets Was Not Against the Manifest Weight of the Evidence

Patricia argues that the trial court erred in finding that Robin's $4,000 payment to Isom for rent was not dissipation

of marital assets. Patricia also argues that Robin dissipated marital funds by paying an additional $400 per month in rent payments that totaled $2,400 to Isom, $8,450 in withdrawals from the marital checking account, and $3,500 in withdrawals from the marital savings account. Patricia claims that Robin failed to establish how these funds were spent for marital purposes or reasonable living expenses. Patricia argues that these expenditures were made by Robin at a time when the marriage was suffering from an irretrievable breakdown and the parties were not living together.

Because determinations regarding dissipation of marital assets are factual, the trial court's decision will not be reversed unless it is against the manifest weight of the evidence. In re Marriage of Vancura, 356 Ill. App. 3d 200, 205, 825 N.E.2d 345, 349 (2005).

Patricia argues that the fact that the initial $4,000 check for rent paid to Isom was written 10 months after Robin had moved into Isom's home indicates it was not a necessary living expense. In its memorandum decision, the trial court found that Robin had dissipated $2,374.05 from marital accounts. It found that half the expenses incurred by Robin when he took Isom on trips were dissipation. In regard to the rent payments, the court found that rent is a legitimate living expense and did not constitute dissipation. See In re Marriage of Hagshenas, 234

Ill. App. 3d 178, 197, 600 N.E.2d 437, 451 (1992). The court held that the fact that the rent was paid to Robin's paramour did not mandate a finding of dissipation. The nature of the payment being one lump sum does not render the trial court's finding contrary to the manifest weight of the evidence. Rent is a legitimate living expense. Whether the $4,000 check in this case constituted rent was an issue for the trial court to resolve. In light of the evidence that Robin's rent was based on comparable housing in the area and the fact that Robin attested to paying his parents rent for the months he lived with them, the trial court's finding is not without support in the record.

With regard to the ATM withdrawals, the trial court found that Patricia had listed the amounts Robin withdrew and claimed that it is Robin's burden to prove how the funds were spent. The court held that "[i]t is more equitable to require a preliminary showing of dissipation before the burden shifts to the party charged with dissipation to refute the accusations." The court cited In re Marriage of Murphy, 259 Ill. App. 3d 336, 339, 631 N.E.2d 893, 895 (1994). However, once a prima facie case for dissipation has been made, the burden shifts to the party charged with dissipation to prove by clear and specific evidence how the funds were spent. In re Marriage of Jerome, 255 Ill. App. 3d 374, 394, 625 N.E.2d 1195, 1210 (1994). At trial, Robin presented receipts that he claimed were a "representative

sample" of his expenditures. He did not have documentation to support every withdrawal. The court found that Patricia had failed to establish a prima facie case for dissipation. The court held that Robin testified to his routine use of the ATM and savings account and the court believed Robin's testimony that the money was used for regular living expenses.

The trier of fact is charged with assessing the credibility of testimony at trial. In re Marriage of Murphy, 359 Ill. App. 3d 289, 302, 834 N.E.2d 56, 67 (2005). A reviewing court will defer to the trial court's findings because the trial court, "by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility." In re Commitment of Sandry, 367 Ill. App. 3d 949, 980, 857 N.E.2d 295, 319 (2006).

The trial court emphasized that it "believed" Robin's testimony regarding the withdrawals from the ATM and savings account. Even if it found that Patricia had made a prima facie case for dissipation, the court clearly believed Robin's testimony that the funds were used for legitimate living expenses. "On appeal, a reviewing court will take questions of witness credibility as resolved in favor of the prevailing party and must draw from the evidence all reasonable inferences that support the judgment." Flynn v. Henkel, 369 Ill. App.3d 328, 333, 859 N.E.2d 1063, 1067 (2006). Therefore, we defer to the

trial court's finding of credibility and affirm the court's finding that Robin's use of marital funds for rent and living expenses was reasonable and did not constitute dissipation.

C. The Trial Court's Treatment of Attorney Fees Was Proper

Robin argues that the trial court erred in implementing its plan to divide the attorney fees equally between the parties. This court will reverse a trial court's decision regarding the division of marital assets only if it finds the trial court abused its discretion. In re Marriage of Suriano, 324 Ill. App. 3d 839, 846, 756 N.E.2d 382, 388 (2001).

During the hearing on Robin's motion to reconsider, the trial court said:

> "I think the attorney[-]fee adjustment and the allocation is an extremely interesting issue that should be decided by the appellate court. So[,] I am not going to grant the [m]otion for [m]odification, so each side can appeal and get this thing resolved."

The trial court found that Robin incurred $23,652.04 in attorney fees and costs during the course of the litigation and paid $23,414.54 from marital funds. That left an unpaid balance of $237.50. Patricia incurred $34,130.68 in attorney fees and costs and paid from marital funds $4,797.40. This left an unpaid balance of $30,332.78. In its memorandum decision, the trial

court stated that the parties' attorney fees were approximately equal. The memorandum decision stated, "It is the intent of the court to reach a 50/50 division of assets." The court directed each party pay his/her own attorney fees "[c]onsidering the value of the assets and a 50/50 division."

Robin argues the trial court made a mathematical error when it considered the paid attorney fees as dissipation of marital assets and allocated the unpaid attorney fees as marital debt. Robin argues "The trial [c]ourt clearly intended that the parties share these fees equally." However, the trial court's order did not say that its intent was to divide the fees equally. The memorandum decision clearly states its "intent" was to divide the assets equally. Robin argues that "by treating the paid fees as dissipation without also recognizing them as marital debt, the trial [c]ourt mistakenly required Robin to pay more than one-half of the total fees incurred." The trial court's memorandum decision, entered before full disclosure of each party's attorney fees, did not, however, state that the court intended each party to pay one-half of the fees incurred; it stated its intent was to divide the assets equally.

Contrary to Robin's argument, the trial court did not make a mathematical error when it ordered Robin to pay Patricia $9,308.32 for his net dissipation of marital funds.

Together, Patricia and Robin paid $28,211.94 in marital

- 25 -

funds on attorney fees.  Patricia paid $4,797.40 and Robin paid $23,414.54.  The court subtracted the amount Patricia paid from what Robin paid to find the difference between Robin's and Patricia's.  That amount was $18,617.14.  The trial court divided this amount in half as half the marital funds belonged to Robin, $9,308.32.  Therefore, Robin owed Patricia $9,308.32 in funds that would have been rightfully hers had no dissipation occurred.  Effectively, each party's apportionment of the total marital estate is increased by $9,308.32.  However, Robin has already used his portion of the funds.  If Robin had not used the money to pay his attorney, the debt would increase by $18,617.14 and the parties would divide that equally; however, there would be $18,617.14 more in the marital estate to divide.  Therefore, the outcome would have been the same.

The trial court did not abuse its discretion by allocating the remaining debt between the parties and ordering Robin to reimburse the marital estate for $9,308.32, representing half the funds he used from the marital account to pay his attorney prior to the final allocation of the marital property.

### D. The Trial Court's Award of Maintenance Was Not an Abuse of Discretion But May Be Reconsidered on Remand

The trial court indicated that the $1,000 monthly maintenance award to Patricia accounted for the court's reservation of jurisdiction of Robin's pension.  Robin does not contest this award of maintenance, but he argues that if this

court remands or reverses any portion of the property division, including the TRS pension plans, the maintenance award should be reevaluated by the trial court as well. Patricia argues that in addition to one-half Robin's TRS pension, she should also receive maintenance under the factors set forth in section 504 of the Illinois Marriage and Dissolution of Marriage Act. 750 ILCS 5/504(a) (West 2004). Specifically, Patricia cites her greater need, Robin's greater earning capacity, the impairment of her present and future earning capacity due to her devoting time to domestic duties and having foregone employment or career opportunities due to marriage, the standard of living during the marriage, and the duration of the marriage.

A reviewing court will not overturn a trial court's award of maintenance absent a finding that either the trial court abused its discretion or that the award of maintenance was against the manifest weight of the evidence. In re Marriage of Harlow, 251 Ill. App. 3d 152, 156, 621 N.E.2d 929, 933 (1993) ("The award of maintenance to a spouse is a matter within the sound discretion of the trial court, and on appeal, we will not reverse its decision unless it constitutes and abuse of discretion or is against the manifest weight of the evidence." (emphasis added)). Section 504(a)(1) lists "the income and property of each party, including marital property apportioned and non[]marital property assigned to the party seeking

- 27 -

maintenance" as a factor courts should consider when determining whether, and how much, maintenance to order one spouse pay the other spouse. 750 ILCS 5/504(a)(1) (West 2004). The trial court properly waited until after it divided the assets to award maintenance in this case. See 750 ILCS 5/504(a)(1) (West 2004).

The trial court did not abuse its discretion when it ordered Robin to pay Patricia $1,000 monthly maintenance award. The trial court's comments in this case indicate the $1,000 award of maintenance to Patricia was intended to compensate her for the trial court's decision to reserve jurisdiction on Robin's pension. In light of our foregoing findings that the decision to reserve jurisdiction over Robin's pension was incorrect, the trail court's maintenance award is vacated. After the division of Robin's pension, the trial court should reevaluate whether maintenance should be awarded using the factors set forth in section 504. We note courts may consider several factors under section 504 when awarding maintenance, and our holding here is limited to the extent that after the allocation of Robin's pension, the court should reevaluate its award in light of the statutory factors.

III. CONCLUSION

Therefore, for the foregoing reasons, we reverse the trial court's reservation of jurisdiction over Robin's pension and remand for apportionment of this marital property, affirm the

trial court's findings with regard to dissipation and attorney fees, and vacate the order of maintenance.  We otherwise affirm.

Affirmed in part, reversed in part, and vacated in part; cause remanded with directions.

STEIGMANN, P.J., and APPLETON, J., concur.