# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Berberet*, 2012 IL App (4th) 110749

---

| | |
|---|---|
| Appellate Court Caption | In re: the Marriage of REBECCA BERBERET, Petitioner-Appellant, and DAVID J. BERBERET, Respondent-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-11-0749 |
| Argued | July 11, 2012 |
| Filed | August 10, 2012 |
| Rehearing denied | August 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment dissolving the parties' marriage was affirmed where the trial court did not abuse its discretion in deviating downward from the statutory guidelines as to respondent father's support guidelines, allocating the tax exemptions for the children, disregarding respondent's potential personal injury claim, dividing the marital estate without considering petitioner's outstanding attorney fees, and distributing the retirement accounts. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 08-D-799; the Hon. Steven H. Nardulli, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Peggy J. Ryan (argued), of Sorling, Northrup, of Springfield, for appellant. |
| | |
| | Diana N. Cherry, of Metnick, Cherry, Frazier & Sabin, LLP, of Springfield, for appellee. |
| | |
| Panel | JUSTICE COOK delivered the judgment of the court, with opinion. |
| | Justices Steigmann and McCullough concurred in the judgment and opinion. |

## OPINION

¶ 1    On May 23, 2011, the trial court entered an order dissolving the marriage of petitioner, Rebecca Berberet, and respondent, David Berberet.

¶ 2    On appeal, Rebecca argues that the trial court (1) abused its discretion in deviating downward from the statutory guidelines David's child support obligation; (2) abused its discretion in equally allocating the tax exemptions for the parties' children; (3) abused its discretion in disregarding David's potential personal injury claim; (4) abused its discretion in failing to find David's use of $21,725.17 of a workers' compensation settlement constituted dissipation; (5) erred in determining that a series of certificates of deposit were nonmarital property; (6) erred in determining that the certificates of deposit were not dissipated; (7) erred in valuing David's vehicle at $33,875 and not charging him with dissipation for the depreciation of the vehicle's value; (8) abused its discretion in dividing the marital estate without accounting for her outstanding attorney fees; and (9) erred in valuing and distributing the parties' retirement accounts. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    In October 1991, Rebecca and David were married. During their marriage, they had three children, Drake (born April 12, 1991), Benjamin (born July 3, 2000), and Meagan (born December 13, 2002). At the time of the dissolution hearing, Rebecca was 43 years old and David was 42 years old.

¶ 5    During the marriage, Rebecca was first employed by Memorial Health Systems. While working for Memorial Health Systems, Rebecca earned a master's degree in business administration. Rebecca then worked as a financial officer for Springfield Obstetric and Gynecological Associates (SOGA). In spring 2011, SOGA merged with Springfield Clinic. As a result of the merger, Rebecca is currently employed as a financial officer by Springfield Clinic. In 2010, Rebecca earned $88,969, including a $1,275 bonus from her employment with SOGA.

¶ 6    In terms of retirement funds, Rebecca has a SOGA profit-sharing account. In 2009, the account had a value of $30,332. At the time of the dissolution hearing, Rebecca was 80% vested in the retirement account and scheduled to be fully vested in March 2011. Rebecca also has a 401k and profit-sharing account with Springfield Clinic. From her previous employment with Memorial Health Systems, Rebecca has a pension valued at $64,345.

¶ 7    Throughout the marriage, David was employed by the City of Springfield as a full-time police officer. He also worked part-time at Madison Park Place in Springfield. In 2010, David earned $71,744.99 working for the City of Springfield and $6,290 working for Madison Park Place.

¶ 8    David has a City of Springfield pension valued at $216,093. He also has a brokerage account with Edward Jones. He established the account with stock he inherited from his grandfather. At the time of the dissolution hearing, the account was valued at $241,409.

¶ 9    During the marriage, David received three gifts from his grandfather totaling $38,000. He received $12,000 on January 6, 2006; $13,000 on January 13, 2007; and $13,000 on January 13, 2008. Initially, David deposited the checks from his grandfather into the parties' joint account at Springfield City Employees Credit Union (Credit Union). The parties established the account in April 1997. David testified that he did not know that Rebecca's name was on the account; however, Rebecca's signature appears below David's on the documentation establishing the account. David used some of the money gifted to him by his grandfather to pay off the parties' second mortgage and credit card debt.

¶ 10   David also used the money gifted to him by his grandfather to purchase a series of certificates of deposit (CDs). On February 2, 2006, David purchased three CDs at the Credit Union. David withdrew $10,000 from the parties' joint account at the Credit Union to purchase the CDs. The CDs had the same account number as the parties' joint account. On August 2, 2007, David cashed in those CDs and opened two new CDs, one for $7,500 (CD No. 1562) and one for $2,500 (CD No. 1563). On November 5, 2008, David cashed in CD No. 1563. Rebecca's divorce petition was filed the next day. According to David, he used monies liquidated in 2008 to pay duck hunting lease fees of $1,250 and to pay a retainer to his attorney. David liquidated CD No. 1562 to open college funds for the parties' three children.

¶ 11   On February 8, 2007, David purchased with funds from the parties' joint account at the Credit Union a CD for $5,000 (CD No. 1492) and rolled over the CD (CD No. 1654). On May 5, 2008, David closed CD No. 1654.

¶ 12   On March 16, 2007, David purchased with funds from the parties' joint account a CD for $10,000 (CD No. 1507) and eventually purchased CD No. 1690 for $3,000 and CD No. 1691 for $2,000. A check was issued for $5,000 on April 2, 2008. CD No. 1691 was closed on July 27, 2009. David testified that he used the money to take the children on a vacation to Minnesota. On November 25, 2008, CD No. 1690 was closed.

¶ 13   On September 19, 2007, David purchased CD No. 1586 for $2,500. Approximately a month later, the CD was closed to help fund the children's college fund.

¶ 14   On November 6, 2008, Rebecca filed a petition for dissolution of marriage. In June 2009, the couple started living in separate homes.

¶ 15    On August 5, 2009, the trial court issued a temporary order setting forth David's child support obligation. The court determined that David's net monthly income from his City of Springfield job was $4,033 and set his temporary child support obligation at $1,290 per month. At that time, the court also denied David's request for a downward deviation in child support.

¶ 16    In February 2010, the City of Springfield paid David a workers' compensation settlement of $46,786.81, because of a shoulder injury he received while undergoing police training in March 2006. On February 18, 2010, after attorney fees were paid, David deposited the remaining $36,401.05 from his workers' compensation settlement into a Credit Union account. From that account, David made numerous cash withdrawals. David testified that he made the withdrawals to pay rent, attorney fees, credit card debit, and normal expenses. He also claims that he used the money to take three vacations, including a family trip to Minnesota. As of the end of 2010, there was $14,675.88 in the account.

¶ 17    In July 2010, after his vehicle was totaled in a car accident, David purchased a 2010 Chevy Tahoe for $43,855. The cash price was reduced by $4,496.79, because David received an allowance from points on the parties' joint GM credit card. David also applied insurance proceeds of $24,000 to the vehicle's purchase price. The court valued David's vehicle at $33,875, the Kelly Blue Book value for the vehicle in "good condition."

¶ 18    At the time of the dissolution hearing, David had talked to an attorney about the success of filing a personal injury claim to recover damages for the back pain he experienced after the car accident. David testified that, as of the dissolution hearing, his attorney had not taken any action on his behalf.

¶ 19    In September 2010, Rebecca opened a Bank of Springfield account with $29,085.46 in settlement proceeds she received from a personal injury claim against Bausch & Lomb. That same month, she also purchased a 2010 Honda Odyssey for $31,926. The court valued Rebecca's vehicle at $31,945.

¶ 20    On January 7 and 11, 2011, a dissolution hearing was held.

¶ 21    On January 19, 2011, Rebecca filed a motion for contribution to attorney fees. At the time, Rebecca owed $11,455.50 in attorney fees and had paid $6,440 in fees. No hearing was conducted on the motion.

¶ 22    On April 5, 2011, the trial court issued a memorandum of opinion. The court concluded that Rebecca's salary was $7,321.97 per month and David's salary was $5,987.75 per month from the City of Springfield. In addition to his salary as a police officer, David earned $524.17 per month from Madison Park Place and $3,808 in yearly income from nonmarital assets. The court determined that David's net pay was $4,479 per month and the guideline amount of child support for the three children was $1,433.

¶ 23    The trial court ordered David to pay Rebecca $1,000 per month in child support, which amounted to a downward deviation from the 32% required under section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505(a) (West 2008)). The court stated that it was deviating from the statutory guidelines, because "application of the child support guidelines would result in two extremely disparate financial households." In making its determination, the court found that, before the award of child support,

-4-

Rebecca's net income exceeded David's net income by $1,123 per month. The court further determined that awarding Rebecca the guideline amount of support would result in her net monthly income exceeding David's by $4,000 (difference between $7,035 per month and $3,046 per month). The court also found that "[i]f the support guidelines were applied, David would be substantially unable to participate in the children's school, athletic and social activities or to enjoy any recreational activities with the children." In addition to his child support payment, the court ordered David to continue providing health insurance coverage for the children.

¶ 24    The trial court allotted David and Rebecca each one child as a tax dependency exemption and ordered that the exemption for the third child be alternated, from year to year, between them.

¶ 25    The trial court intended to apportion the marital estate equally between the parties. The court divided the marital assets as follows:

| | Rebecca | David |
|---|---|---|
| Marital home | $233,00 | |
| 2010 Chevy Tahoe | | $33,875 |
| 2010 Honda Odyssey | $31,945 | |
| Weldbilt jon boat | | $2,000 |
| Suzuki four-wheeler | | $1,500 |
| David's Springfield 457 retirement plan | | $121,716 |
| Rebecca's Valic-403(b) | $31,000 | |
| David's police pension | | $216,093 |
| Rebecca's Memorial Health Systems pension | $64,345 | |
| Rebecca's SOGA profit-sharing account | (to be determined) | |
| Bank of Springfield money market account | $26,192 | |
| Vanguard IRA | $8,112 | |
| Guns | | $5,404 |
| David's Credit Union account | | $10,177 |
| David's Credit Union account | | $449 |
| Rebecca's PNC account | $500 | |
| Total Marital Assets | $395,094 | $391,214 |

¶ 26    The trial court divided the marital liabilities as follows:

| | Rebecca | David |
|---|---|---|
| Williamsville State Bank | $85,091 | |
| 2010 real estate taxes | $5,200 | |
| Harris Bank (truck loan) | | $15,745 |

| | | |
|---|---|---|
| Heartland Credit Union (van loan) | $29,051 | |
| J.C. Penney credit card | $226 | |
| Old Navy credit card | $256 | |
| Visa | $4,854 | |
| Macy's credit card | $258 | |
| National City credit card | $365 | |
| Edwards Jones credit card | | $1,832 |
| Sam's Club credit card | $950 | |
| Total Marital Liabilities | $126,251 | $17,577 |

¶ 27　In dividing the marital estate, the trial court did not include a value for Rebecca's SOGA profit-sharing account. At the time of the disposition hearing, Rebecca's profit-sharing account was 80% vested. The court determined that it was "reasonably foreseeable" that Rebecca would remain at SOGA long enough for her interest in contributions made during the marriage to vest. The court stated its intention to value the account at 100% of its value as of December 31, 2010. However, the account's value as of December 31, 2010, would not be known until March 2011. The court stated that, when the value of the profit-sharing account is known, the account should be awarded to Rebecca and David should be given a setoff equal to one-half of the value of the account against his equalization payment of $52,397.

¶ 28　The trial court determined that David did not dissipate $24,500 of CDs, because (1) the transactions involving the CDs occurred prior to the marriage irreconcilably breaking down and (2) David's use of the money during the period that the marriage had irreconcilably broken down was adequately explained. Moreover, the court concluded that the CDs were David's nonmarital property and were only deposited into the marital account as a conduit.

¶ 29　The trial court directed each party to pay his or her own attorney fees.

¶ 30　On May 20, 2011, the parties entered into a joint-parenting agreement. Under the terms of the agreement, Rebecca is the primary custodial parent, while David is scheduled to have the children on each weekend day he is not working and for one overnight weeknight visit per week. During the summer, David is scheduled to have the children on his days off work.

¶ 31　On May 23, 2011, the trial court entered a judgment of dissolution of marriage incorporating the findings of the memorandum of opinion and the joint-parenting agreement. In the judgment, the court ordered David to make an equalization payment of $28,163. The equalization payment includes a setoff of $24,234, one-half the value of Rebecca's SOGA profit-sharing account as of December 31, 2010.

¶ 32　On June 22, 2011, David filed a motion for reconsideration, arguing that the trial court erred in requiring that his equalization payment be made in cash rather than by a transfer from retirement funds.

¶ 33　On July 22, 2011, the trial court granted David's motion.

¶ 34　This appeal followed.

¶ 35    II. ANALYSIS

¶ 36    A. Downward Deviation From Guidelines

¶ 37    "Child support is a matter within the sound discretion of the trial court, and this court will not disturb the trial court's determination absent an abuse of discretion. [Citation.]" *In re Marriage of Deem*, 328 Ill. App. 3d 453, 457, 766 N.E.2d 661, 665 (2002). Section 505(a)(1) of the Act (750 ILCS 5/505(a)(1) (West 2008)) establishes guidelines to determine the minimum amount of child support to be paid by the noncustodial parent. *In re Keon C.*, 344 Ill. App. 3d 1137, 1141, 800 N.E.2d 1257, 1261 (2003). Section 505(a) of the Act creates a rebuttable presumption that a specified percentage of a noncustodial parent's income represents an appropriate child-support award. *Keon C.*, 344 Ill. App. 3d at 1141, 800 N.E.2d at 1261. In the case of three children, the minimum amount of support is 32% of the supporting parent's net income. 750 ILCS 5/505(a)(1) (West 2010). The trial court must award the guideline amount of support unless the court (1) makes a finding, after considering the best interests of the child, that the application of the guidelines would be inappropriate; (2) states the amount of support that would have been required under the guidelines, if determinable; and (3) indicates the reason for the variance from the guidelines. 750 ILCS 5/505(a)(2) (West 2010). Despite the existence of child support guidelines, the setting of child support is a judicial function. *Slagel v. Wessels*, 314 Ill. App. 3d 330, 332-33, 732 N.E.2d 720, 722 (2000). The trial court is required to exercise its best judgment in setting child support, whether the amount set is higher or lower than the guidelines.

¶ 38    Rebecca argues that the trial court abused its discretion in deviating downward from the guideline amount of child support set forth under section 505(a) of the Act.

¶ 39    Based on the record, we find that the trial court correctly followed the procedure set forth in section 505(a) of the Act for deviating from the support guidelines. The court calculated the amount of support required under the guidelines, $1,433 per month, and determined that the amount was not appropriate. In accordance with section 505(a) of the Act, the court also stated the reasons for its variance from the guidelines. As authorized under section 505(a)(2)(e) of the Act (750 ILCS 5/505(a)(2)(e) (West 2010)), the court considered the financial resources and needs of the noncustodial parent. The court found that if the guideline amount was awarded, Rebecca's net monthly income would exceed David's by nearly $4,000, the difference between $7,035 per month and $3,046. As a result, the court determined that David would experience financial constraint if he was required to pay the guideline amount of support. Last, the court determined that if the support guidelines were imposed David's involvement with the children would be adversely affected: "David would be substantially unable to participate in the children's school, athletic and social activities or to enjoy any recreational activities with the children. Such a result is not in the children's best interests." The court did not abuse its discretion in awarding the downward deviation in support.

¶ 40                                  B. Tax Exemption

¶ 41      The trial court's allocation of tax dependency exemptions for the parties' children is subject to an abuse of discretion standard of review. *In re Marriage of Fowler*, 197 Ill. App. 3d 95, 99, 554 N.E.2d 240, 242 (1990). "An abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Moore*, 307 Ill. App. 3d 1041, 1043, 719 N.E.2d 326, 328 (1999).

¶ 42      David claims that Rebecca has forfeited the issue as to whether the trial court erred in allocating the tax exemptions for the parties' children, because she failed to raise the issue before the court. *Einstein v. Nijim*, 358 Ill. App. 3d 263, 275, 831 N.E.2d 50, 60 (2005) (failure to raise an issue in the trial court results in forfeiture of the issue). Rebecca did not specifically object to the allocation of the tax exemptions at trial, but in her posttrial motion she asked the court to reconsider setting child support according to the statutory guidelines. Assuming that Rebecca did not forfeit the issue, the court did not abuse its discretion in allocating the tax exemptions for the parties' children.

¶ 43      The trial court awarded the parties each one child for tax dependency and exemption purposes and ordered the third child alternated from year to year. The parties share joint custody of the children. Rebecca is the primary custodial parent, while David is scheduled to have the children at least once a week during the school year and on his days off during the summer. In its memorandum of opinion, the court acknowledged Rebecca's greater contribution to the care of the children, but still found that the tax exemptions should be alternated between the parties.

¶ 44      In this case, both parties contribute to the costs associated with raising their children. David provides financial support to the children in the form of monthly child support payments, $1,000, and health-care payments, $219.98. He is also responsible for the costs associated with caring for the children while they are staying at his home. However, as the primary custodial parent, Rebecca is responsible for more of the costs associated with "maintaining a home, purchasing food for the family, laundering the family's clothing, and maintaining the family mode of transportation." *Stockton v. Oldenburg*, 305 Ill. App. 3d 897, 901-02, 713 N.E.2d 259, 263 (1999). We find that David's contribution to the costs associated with raising the children is not so disparate from Rebecca's that no reasonable person would agree with the court's allocation of the tax exemptions for the parties' children.


¶ 45                          C. Potential Personal Injury Claim

¶ 46      The trial court's allocation of property is subject to an abuse of discretion standard of review. *In re Marriage of Awan*, 388 Ill. App. 3d 204, 213, 902 N.E.2d 777, 786 (2009).

¶ 47      In summer 2010, David was involved in a motor vehicle accident. As a result of the accident, he totaled his truck. Insurance covered the damage to his vehicle. At the time of the dissolution hearing, David had not filed a personal injury claim; however, he did not rule out the possibility, testifying that "it depended" whether he would pursue a demand against the insurance company. He also testified that he called an attorney concerning the injuries he received from the accident. According to David, as of the dissolution hearing, his attorney had not taken any action on his behalf.

¶ 48 Rebecca argues that the trial court abused its discretion in failing to consider David's potential personal injury claim as an asset of the marriage, because personal injury awards accruing during a marriage are marital assets subject to division. In support of her argument, Rebecca relies on the following three cases: *In re Marriage of Toth*, 224 Ill. App. 3d 43, 586 N.E.2d 436 (1991); *In re Marriage of Pace*, 278 Ill. App. 3d 932, 664 N.E.2d 320 (1996); and *In re Marriage of DeBow*, 236 Ill. App. 3d 1038, 602 N.E.2d 984 (1992). However, those cases involve personal injury claims filed before or during the pendency of the dissolution proceeding. As of the dissolution hearing, David had not filed a personal injury claim. Based on the record provided, it is too speculative as to whether David will file a personal injury claim within the statute of limitations. While we do not want to encourage parties to delay the filing of a personal injury claim until after their dissolution proceeding is concluded, we cannot say that in this case the trial court abused its discretion by not considering David's potential personal injury claim.

¶ 49                    D. Dissipation of Workers' Compensation Settlement

¶ 50 "Dissipation refers to a spouse's use of marital property for his or her sole benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700, 843 N.E.2d 478, 483 (2006). The spouse charged with dissipation must show, by clear and convincing evidence, how the marital funds were spent. *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 830, 633 N.E.2d 82, 93 (1994). General and vague statements that funds were spent to pay bills or on marital expenses are insufficient to refute a finding of dissipation. *Dunseth*, 260 Ill. App. 3d at 830, 633 N.E.2d at 93-94. In making its decision as to dissipation, the trial court must determine the credibility of the spouse charged with dissipation. *Dunseth*, 260 Ill. App. 3d at 830, 633 N.E.2d at 94. The standard of review for a trial court's finding of dissipation is the manifest weight of the evidence. *Awan*, 388 Ill. App. 3d at 217, 902 N.E.2d at 789.

¶ 51 Any possible dissipation of marital or nonmarital assets is but one factor to be considered in the division of property. *In re Marriage of Murphy*, 259 Ill. App. 3d 336, 340, 631 N.E.2d 893, 896 (1994). Even where dissipation is established, the circuit court "is not *required* to charge against a party the amounts found to have been dissipated but *may* do so." (Emphases in original.) *Murphy*, 259 Ill. App. 3d at 340, 631 N.E.2d at 896.

¶ 52 Rebecca argues that the $21,725 David spent from his workers' compensation settlement constituted dissipation of a marital asset.

¶ 53 In February 2010, David received a workers' compensation settlement of $46,786.81 for an injury he suffered in 2006. That same month, he deposited $36,401.05, the workers' compensation award minus attorney fees, into a Credit Union savings account. From that account, David made numerous withdrawals. From February 2010 to October 2010, David made cash withdrawals totaling $4,200. David claims that he used the settlement money to pay rent, attorney fees, credit card debt, and normal expenses. He also claims that he used the money to pay for three vacations, including a family vacation in Minnesota, a hunting trip in Arkansas, and a trip to Las Vegas. As of the end of 2010, $14,675.88 was in the account.

¶ 54 The trial court found that David adequately explained the use of money from his workers'

compensation settlement and the money was used for a legitimate marital purpose. In making its determination, the court emphasized that recreation and vacations consistent with the lifestyle established during the parties' marriage constitute a legitimate marital purpose. Last, the court considered that "David's use of cash and Rebecca's accumulation of credit card debt was a comparable and balancing use of marital assets, with each party reducing the size of the marital estate in their own separate way for similar marital purposes."

¶ 55 David had the burden of showing how the money from his workers' compensation settlement was spent. *Dunseth*, 260 Ill. App. 3d at 830, 633 N.E.2d at 93. To explain his expenditures, David submitted to the court his statements for the Credit Union savings account in which he initially deposited the workers' compensation award. He also submitted the statements for his Credit Union checking account into which he transferred monies from the savings account to pay expenses. For example, David testified that in August 2010, he transferred $5,000 from his savings account to his checking account to pay off the balance of the parties' joint GM credit card. The transfer of funds, as testified to by David, is reflected in the statements for David's Credit Union saving and checking accounts.

¶ 56 In regard to the cash withdrawals at issue, David testified that he could not recall the specific purpose of the withdrawals; however, he stated that he routinely used cash to make purchases. David testified in relevant part: "I pay cash for a lot of things, when I go out, when I go to the grocery store, when I go many places. I don't recall what I did with any specific withdrawal that I made or when I made it." David also testified that he used cash to purchase one of the beds necessary to furnish the townhouse he rented. Although, at trial, David could not recall the nature of specific expenditures and dates for those expenditures, he provided the court with the relevant financial records and testified to his routine use of cash. In addition, the trial court found David's testimony regarding the cash withdrawals was credible. "A reviewing court will defer to the trial court's findings because the trial court, 'by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility.' " *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477, 874 N.E.2d 880, 890 (2007) (quoting *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 980, 857 N.E.2d 295, 319 (2006)).

¶ 57 In regard to David's vacation expenditures, the expenditures were not excessive or inconsistent with the parties' lifestyle during the marriage. Both David and Rebecca took the children on vacation. David took the children to Minnesota for their annual family vacation, while Rebecca took the children to the Lake of the Ozarks, Chicago, St. Louis, and Tennessee. David also took two vacations without the children. He went on a hunting trip to Arkansas and a vacation to Las Vegas, Nevada. At the dissolution hearing, David testified that he usually hunted 30 to 40 days per year.

¶ 58 The trial court did not specifically address whether David's payment of attorney fees constituted dissipation. The use of marital assets to pay fees to one's attorney for the costs of the divorce constitutes dissipation of marital assets. *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 112, 728 N.E.2d 1278, 1284 (2000). "The plain language of section 501(c-1)(2) makes apparent that the trial court is required to treat the parties' attorney fees as advances, '*[u]nless otherwise ordered.*' [Citations.]" (Emphasis in original.) *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 378, 899 N.E.2d 355, 364-65 (2008). Rebecca failed to

provide sufficient evidence as to the source of payment of David's attorney fees as well as her own. From the record, it is apparent that David used both marital and nonmarital funds to pay his attorney fees. It appears equally apparent that Rebecca's payment of $6,440 in attorney fees was paid from marital funds. The court ordered both parties to pay their own attorney fees. We find that the court's determination was not against the manifest weight of the evidence, because both parties appear to have dissipated marital assets in a seemingly similar amount.

¶ 59        E. Property Classification of Certificates of Deposit

¶ 60        "A trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence." *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166, 728 N.E.2d 1137, 1143 (2000). A court's decision is contrary to the manifest weight of the evidence if the opposite conclusion is clearly evident or if its findings are unreasonable, arbitrary, and not based upon any of the evidence. *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 356, 831 N.E.2d 1222, 1228 (2005).

¶ 61        The trial court determined that a series of CDs opened by David were nonmarital property. Rebecca argues that the court's classification was erroneous. In making its determination, the court pointed to the fact that the money used to purchase the CDs was from a nonmarital source, three separate gifts from David's grandfather. The court concluded that David's deposit of the money from his grandfather into the parties' joint bank account was not intended to be a gift to the marriage, because David deposited the monies with the express intent that they would be placed into CDs and the "marital account was merely a conduit." The court also found that "[v]irtually all of the transactions [involving the CDs] occurred prior to the time that the marriage had irretrievably broken down, and therefore rules regarding the reimbursement of money to the marriage because of claims of dissipation do not apply."

¶ 62        We find that the trial court's determination that the CDs were David's nonmarital property was not against the manifest weight of the evidence. The mere fact that the money for the CDs flowed through the parties' joint account does not make the CDs a marital asset. "Although the placement of nonmarital funds into a joint checking account may transmute the nonmarital funds into marital property [citations], nonmarital funds that are placed into a joint account merely as a conduit to transfer money will not be deemed to be transmuted into marital property [citations]." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 673, 895 N.E.2d 1025, 1055 (2008). From the opening of the account, David continuously controlled the account. Rebecca did not deposit funds into the account. Moreover, David testified that when he deposited the money from his grandfather into the joint account he intended to use that money to buy CDs. Last, the court found David's testimony as to his intent to be credible. The trial court was in the best position to assess the credibility of the parties. *Manker*, 375 Ill. App. 3d at 477, 874 N.E.2d at 890.

¶ 63        F. Dissipation of Certificates of Deposit

¶ 64        Rebecca argues that the trial court erred in finding that David's expenditures from the

CDs did not constitute dissipation of marital assets. Because the CDs were nonmarital property, there was no dissipation of marital assets. As we previously discussed, David's deposit of each of the checks from his grandfather into the parties' joint account was not enough to transmute the funds into marital property.

¶ 65                                    G. Tahoe

¶ 66    Rebecca claims that the trial court erred in placing a value of $33,875 on David's Chevy Tahoe without charging him with dissipation. In July 2010, David purchased a Tahoe for $43,855. Approximately eight months later, the court valued the Tahoe at approximately $10,000 less.

¶ 67    Property should be valued as of the date of trial or as close to the date of trial as practicable. 750 ILCS 5/503(f) (West 2010). "Further, it is the obligation of the parties in a dissolution proceeding to present the court with sufficient evidence of the value of the property." *In re Marriage of Courtright*, 155 Ill. App. 3d 55, 59, 507 N.E.2d 891, 894 (1987).

¶ 68    First, the trial court did not err in valuing David's Tahoe at $33,875. In valuing the vehicle, the court used the market value for the Tahoe at the time of the dissolution hearing. The value was drawn from the Kelly Blue Book valuation offered into evidence by David. At the time of the dissolution hearing, the Kelly Blue Book value for a 2010 Tahoe in "good condition" was $33,875. Rebecca did not object to the admission of the Kelly Blue Book valuation. She also failed to present an alternative method to accurately determine the value of the vehicle.

¶ 69    Second, the trial court's decision not to assign dissipation to David resulting from the depreciation of the Tahoe's value was not against the manifest weight of the evidence. Rebecca failed to present sufficient evidence that David paid an excessive price for the Tahoe. Further, no evidence was presented that David took actions to cause a depreciation in the vehicle's value. Based on the evidence provided, we cannot say that the record clearly demonstrates that the proper result is the one opposite that reached by the court.

¶ 70                                H. Attorney Fees

¶ 71    Rebecca argues that the trial court erred in failing to take into account her outstanding attorney fees when it divided the marital estate. However, Rebecca failed to ask the court to include her attorney fee debt in its initial allocation of assets.

¶ 72    On January 19, 2011, approximately a week after the close of evidence, Rebecca filed a motion for contribution to attorney fees. She requested that David pay all of her attorney fees. At that time, she owed $11,455.50 in attorney fees and had paid $6,440. No hearing was held on the motion. The court ordered the parties to pay their own attorney fees.

¶ 73    While we agree that a hearing on contribution was appropriate under section 503(j) of the Act (750 ILCS 5/503(j) (West 2010)), it was Rebecca's responsibility to call to the court's attention its failure to hold a hearing. *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 623, 814 N.E.2d 152, 164 (2004). Moreover, we find that the lack of disparity in income

levels between the parties does not warrant contribution. The trial court did not abuse its discretion in failing to take into account her outstanding attorney fees when it divided the marital estate.

¶ 74                                    I. Retirement Accounts

¶ 75                          1. *Rebecca's SOGA Profit-sharing Account*

¶ 76      Rebecca claims that the trial court erred in valuing her SOGA profit-sharing account at $48,468 instead of the $24,266.08 it was worth at the time of the dissolution hearing. The value Rebecca urges the court to use, $24,266.08, was based on the account's 2009 valuation. The account was valued on a yearly basis. At the time of the dissolution hearing, Rebecca was 80% vested in her profit-sharing account. Rebecca testified that she would be fully vested by March 2011. She also testified that she would receive her statement of the account's 2010 year-end balance by March 2011. Section 503(f) of the Act (750 ILCS 5/503(f) (West 2010)) requires that the court value marital property as of the date of trial or as close to the date as is "practicable." In waiting a couple months for the account to vest, the court was able to use a more accurate calculation of the account's value that was more close in time to the dissolution hearing than the account's value for 2009. Further, there was substantial evidence that Rebecca would continue her employment at SOGA until the merger and, thereafter, would continue her position as a Springfield Clinic employee. We find that the court did not abuse its discretion in waiting to value the account.

¶ 77                                    2. *Motion To Reconsider*

¶ 78      Last, Rebecca argues that the trial court erred in granting David's motion to reconsider the source of his equalization payment. On April 5, 2011, the court ordered David to pay Rebecca an equalization payment of $52,397. However, because the court planned on awarding the SOGA profit-sharing account to Rebecca, the equalization payment was to be reduced by one-half the value of Rebecca's SOGA profit-sharing account as of December 31, 2010. After the close of evidence, the parties reached a stipulation as to the value of the SOGA profit-sharing account and the court reduced David's equalization payment to $28,163. On June 22, 2010, David filed a motion to reconsider, urging the court to allow him to make his equalization payment by a transfer of funds from a qualified retirement account. One month later, the court granted David's motion.

¶ 79      We find that the trial court did not err in granting David's motion to reconsider. Section 503(d)(12) of the Act (750 ILCS 5/503(d)(12) (West 2010)) provides for consideration of "the tax consequences of the property division upon the respective economic circumstances of the parties." The majority of David's awarded assets were retirement funds, constituting pretax assets. David had $337,809 in pretax assets, while Rebecca had less than half that amount, $151,925. The court's decision on reconsideration addresses the disproportionate tax consequences of the property division upon David by taking into account that some tax will be due when the parties withdraw money from one of their retirement accounts. In accounting for the tax consequences, the court also made a point of not speculating as to the future tax rate.

¶ 80                            III. CONCLUSION

¶ 81        For the foregoing reasons, we affirm the trial court's judgment.

¶ 82        Affirmed.