**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240064-U

Order filed February 25, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| JACOB BELTRAN, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-24-0064 |
| and | ) | Circuit No. 22-DC-61 |
| | ) | |
| CAITLIN BELTRAN, | ) | Honorable |
| | ) | Richard D. Felice, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justice Anderson concurred in the judgment.
Justice Hettel dissented.

_____

**ORDER**

¶ 1      *Held*: The trial court did not abuse its discretion in its distribution of the marital estate. Specifically, its decision to award the marital residence to the wife based on, *inter alia*, the husband's dissipation was reasonable. In addition, the trial court did not err in imputing income to the husband for the purposes of determining maintenance and child support. Affirmed.

¶ 2      Following a three-day bench trial, the court entered a judgment of dissolution as to petitioner-appellant, Jacob Beltran, and respondent-appellee, Caitlin Beltran, pursuant to the

Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2022)). The court determined that Jacob dissipated the marital estate in the amount of $150,082. It declined to order Jacob to reimburse the marital estate in the exact, corresponding amount and instead pointed to Jacob's dissipation in support of its decision to award Caitlin the marital residence. In addition, it imputed an income to Jacob of $106,000 for purposes of maintenance and child support. Jacob appeals, challenging the distribution of marital property, the dissipation finding, and the imputation of income. For the reasons that follow, we affirm.

¶ 3                                             I. BACKGROUND

¶ 4        On January 20, 2022, Jacob petitioned for divorce against Caitlin. Jacob and Caitlin were both in their early 30's and had been married just over 10 years. They had three children, one boy (age 9) and two girls (age 8 and age 1 month). For most of the marriage, Jacob worked as a police officer for the Elmhurst Police Department and Caitlin stayed home to care for the children. Caitlin returned to work as a nurse shortly before Jacob petitioned for divorce. While acting as the primary caregiver to the three children, Caitlin obtained a nursing position paying $37 per hour, providing 10 hours per week with a chance to increase to 20 hours per week. During the course of the proceedings, Caitlin's mother, who was in her early 60's, worked extra shifts as a nurse so she could contribute to Caitlin's expenses.

¶ 5        In 2020, Jacob met a woman named Tina while conducting a police investigation. Tina was 20 years older than Jacob and of seemingly remarkable wealth; she owned the iconic Brady Bunch house in California, the well-known Stone Manor on Lake Geneva, and a large home in Elmhurst which the parties refer to as a mansion. In July 2021, Jacob left the Elmhurst Police Department and continued his relationship with Tina. According to Caitlin, he spent time at Tina's property both as her security guard and as her romantic partner. In August 2021, Tina provided

Jacob with access to an American Express Black Card. In October 2021, Jacob informed Caitlin that he would not be returning to the marital residence and would instead live with Tina. In November 2021, Jacob married Tina in Las Vegas while still married to Caitlin.

¶ 6    Caitlin and Jacob each provided different accounts of Jacob's departure from the Elmhurst Police Department and the evolving nature of his relationship with Tina. Tina was subpoenaed, hired an attorney to challenge the court's jurisdiction over her, and, for reasons unclear from the record, did not testify.

¶ 7                              A. Caitlin's Testimony

¶ 8    Caitlin testified that, in June 2021, Jacob entered into employment negotiations with Tina and Tina's husband to provide her and/or them with security services. Caitlin submitted into evidence a photograph of a handwritten commitment letter from Tina to Jacob, which Jacob had texted to Caitlin in June 2021. The commitment letter provided:

> "Jake and Cait. Commitment Letter. Any vehicles provided are gifts. We will pay for health insurance. We will gift the maximum annual gift tax exemption (15k) to Jake, Cait, [son] and [elder daughter]. Taxable salary won't exceed 163k annually."

The commitment letter was signed by Tina. In a text message to Caitlin, Jacob wrote beneath the image of the commitment letter: "They also bought a Harley for lake Geneva. A 48, like my old bike. Need to pick it up[.]"

¶ 9    Caitlin also submitted a typewritten employment agreement, specifying that Jacob would provide security services in exchange for $225,000 annually. Caitlin was not sure whether that agreement was ever signed. In further support, Caitlin submitted a photograph of a check from Tina to Jacob, in the amount of $225,000, dated June 23, 2021.

¶ 10    In July 2021, Jacob left his employment with the Elmhurst Police Department to work for Tina. Caitlin believed that Jacob's 2021 salary at the Elmhurst Police Department was between $100,000 and $125,000. (It was later established that the 2019 salary had been $106,000; the 2020 salary had been $100,660; and the first seven months of the 2021 salary had been $63,292, consistent with $108,500 in annual earnings had Jacob continued in the employ of the Elmhurst Police Department.)

¶ 11    On July 19, 2021, Tina deposited $150,000 into a BMO Harris checking account jointly held by Jacob, Caitlin, and Tina. On September 16, 2021, Tina deposited an additional $75,000 into the same account. On October 6, 2021, Tina withdrew $170,00 from the same account. Caitlin submitted into evidence the BMO Harris checking account statements. Caitlin visited Jacob while he was working at Stone Manor. Caitlin met Tina on that visit.

¶ 12    Caitlin testified that Tina provided Jacob with multiple gifts, including three motorcycles, three trucks, two watches, several expensive hats, clothing, and extensive travel experiences. Caitlin summarized, "I could probably keep going." All three motorcycles were Harley Davidsons. Caitlin submitted an exhibit of a photograph that she took of a certificate of title in Jacob's name for one of the Harley Davidsons. Jacob did not disclose the Harley Davidsons on his financial affidavit.

¶ 13    Caitlin testified that Tina provided Jacob with an American Express Black Card ending in numbers 4564. Caitlin submitted into evidence a photograph of a text message from Jacob to Caitlin concerning the Black Card. The text message contained an image of the Black Card. The Black Card had one name on it, Jacob Beltran. Under the image, Jacob had written: "Love it. I'm keeping [the] diesel[.]" Caitlin replied: "Fancy… not like Apple bees[.]"

4

¶ 14        According to Caitlin, communication with Jacob during the proceedings was difficult. Jacob instructed Caitlin to communicate with him through his personal assistant. Caitlin submitted a photograph of a text message stating the same. Also, Jacob offered Caitlin $150,000 cash one month prior to trial, for reasons not entirely clear from the record.

¶ 15        Next, Caitlin testified more specifically to her dissipation claim. For ease of reading, we include Jacob's responses to Caitlin's dissipation testimony before turning to the remainder of Jacob's testimony. On August 11, 2023, Caitlin's attorney served Jacob's attorney with a notice of intent to claim dissipation pursuant to section 503 of the Act. *Id*. §503. In the notice, she alleged that the marriage began to irretrievably break down in October 2021. She alleged that, during the period of irretrievable breakdown, Jacob dissipated the marital estate in the amount of "at least" $174,000. The notice concluded that Caitlin reserved the right to supplement or otherwise amend her notice and specific transactions. She requested "the entry of an Order prior to or at trial requiring Jacob to make adequate compensation or to pay other damages in connection with his activities of dissipation as described above *and for such and other relief just and equitable under the circumstances*." (Emphasis added.)

¶ 16        Caitlin attached Exhibit A to her notice, setting forth a color-coded list of credit card transactions totaling $174,406, dating from August 15, 2021, to July 1, 2023. Four credit cards were at issue: American Express Centurion Black Card, American Express Blue Cash, United 2559, and United 7843.

¶ 17        Jacob, through counsel, objected to the admission of the American Express Centurion Black Card statements supporting the transactions set forth in Exhibit A. He explained that portions of the statements were blacked out and redacted by American Express, including the

5

account holder name and the account number.[1]  Caitlin, through counsel, responded that these were the statements provided by American Express in response to its subpoena request for all documents for cards that Jacob held or for which he was an authorized user.  American Express blacked out charges incurred by persons who were not Jacob.  Caitlin explained: "The Centurion card, there [are] records from X amount of people that were all redacted, aside from the transactions on the Centurion card in [Jacob's] name."  The court overruled Jacob's objection: "Keep going.  Admitted.  That is the return on the subpoena [Caitlin] got."

¶ 18        The American Express Centurion Black Card incurred approximately $125,800 in charges between August 15, 2021, and July 26, 2022.  These charges included approximately $24,000 for a Harley Davidson; $21,000 at Ralph Lauren; $12,000 for Seat Geek; $7500 at the Waldorf Astoria and additional charges at other hotels such as the Peninsula Beverly Hills and the Four Seasons; multiple airline tickets; $4500 at Geneva Liquors; $2100 at Best Buy; and $1800 at Enterprise.

¶ 19        Jacob denied ever owning or making purchases with the American Express Black Card.  However, during his deposition testimony, he had pled the fifth amendment regarding ownership and use of a Black Card.  He denied making any payments toward the American Express Black Card.  Then, on cross-examination, he stated he was "not sure" whether he made a $15,000 payment to the Black Card in August of 2022.

¶ 20        Elsewhere, Jacob acknowledged sharing an American Express credit card with Tina. (It is unclear from the record whether this is the Black Card.)  He also acknowledged that, during his deposition testimony, he had pled the fifth amendment when asked whether he shared an American

[1] Regarding the account holder name, Jacob Beltran's name *does* appear on several of the partially redacted statements.  Regarding the account number, it is unclear from the record whether the American Express Black Card reflected in the subpoenaed statements is connected to the American Express Black Card in the photo text.  Although American Express blacked out the account number on nearly all statement sheets, a few sheets indicate that the account number is 5005.  However, the photo text shows a Black Card ending in account number 4564.

Express credit card with Tina. After an initial equivocation, Jacob acknowledged that, around the time of the $12,000 charge to Seat Geek, he attended the Super Bowl with Tina.

¶ 21    The American Express Blue Cash card incurred approximately $26,458 in charges between March 6, 2022, and July 1, 2023. These charges included approximately $9000 for numerous airline tickets, including to San Jose Cabo, Milan, Honolulu, Boston, and Los Angeles; $4668 for Turo Inc. (a vehicle rental company); $716 at Men's Warehouse, and additional charges at restaurants and retailers such as Cheesecake Factory, Verizon, Amazon, Columbia clothing, and Bodybuilding.com.

¶ 22    Jacob acknowledged that the American Express Blue Cash card was his and that he made the charges on the card. He testified to $7916 of those charges, explaining in part as follows. The $1122 Turo charge was a monthly vehicle rental charge, as Caitlin retained the only marital vehicle. The $1000 charge to the Kreuzer Cores Law Firm was a guardian *ad litem* (GAL) fee. The $716 Men's Warehouse charge was a clothing purchase. Certain charges were gifts, including $695 to Lululemon for Caitlin and $222 to 23 and Me from Caitlin to Jacob. The $1427 was for family iPhones, and additional charges were for phone bills. He charged approximately $500 for two birthday parties for his daughter and $111 for a restaurant meal with his children. Approximately $600 in Addidas Merchandise was ultimately returned and approximately $450 in flights were later reimbursed.

¶ 23    The United 2559 card incurred approximately $18,900 in charges between December 23, 2023, and March 23, 2023. These charges included $6123 in DPG Family Law, $3337 at Richard F. Blass and Associates, $5200 at Wrap Zone in Addison, $937 in airline tickets from LAX to Orlando, and other smaller charges.

¶ 24    Jacob denied that he owned the United 2559 card. However, he acknowledged that he incurred some of the charges. He agreed to his attorney's characterization that the charges were to his attorney in the instant divorce ($6123), his attorney in a criminal matter, and GAL fees.

¶ 25    The United 7843 card incurred approximately $1370 in charges between December 17, 2022, and December 20, 2022. These charges included $500 at Turo Inc. (vehicle rental) and additional charges at Home Depot and American Airlines. Jacob did not testify to the expenses incurred on this card.

¶ 26                                   B. Jacob's Additional Testimony

¶ 27    Jacob acknowledged various fund depletions not included in Caitlin's dissipation claim. In March 2023, Jacob withdrew all of the funds from his Elmhurst 457 plan (deferred compensation plan), in an undisclosed amount, without recording the same on his financial affidavit or otherwise notifying Caitlin. He denied that, shortly thereafter, he transferred $20,000 and $5000 to other accounts, including to Tina.

¶ 28    Jacob also acknowledged that he previously held approximately $90,000 in an Elmhurst pension. He withdrew those funds, again without disclosing that he had done so on his financial affidavit or otherwise informing Caitlin. He transferred the funds into a Schwab account, which he also failed to disclose but ultimately provided one hour before trial. He testified that the Schwab account had a balance of $59,000, though he provided no supporting documentation.

¶ 29    Jacob testified equivocally regarding his romantic relationship with Tina. First, he denied having had a sexual relationship with Tina in October 2021. Then, he avoided answering whether he married Tina in November 2021. He stated only: "That was annulled." Finally, he admitted that he married Tina in Las Vegas in November 2021. Elsewhere, the record shows that an April 2022 GAL order lists Jacob's address as Tina's Elmhurst address. The record also shows that

8

Jacob and *Tina* gave the parties' elder daughter a 2023 Valentine's card, addressed to "our" daughter, saying "we" love you, and signed "Daddy and Momma Tina."

¶ 30    Jacob testified regarding a prior hearing for temporary support. Jacob could not recall if he arrived at the hearing in a Mercedes G-Wagon. He could not recall if he traveled to Lake Como, Italy, within 30 days of the hearing, though he acknowledged going there during the divorce proceedings. Tina paid for all expenses associated with the trip. Jacob informed the court at that hearing that he could not meet his expenses. The court nevertheless imputed an income of $120,000 to Jacob for the purpose of calculating his temporary support obligations.

¶ 31    Jacob testified to two loans he procured to meet his temporary support obligations. Jacob obtained a $50,000 loan from FinWise Bank. He next obtained a $37,000 loan from "Achieve." This loan subsumed the amount remaining on the FinWise loan and had a lower interest rate. Jacob did not disclose the FinWise loan on his financial affidavit. Next, Jacob testified that, in October 2021, Tina loaned him $75,000. The loan document was not signed. Jacob did not offer proof that he had been making the monthly payment set forth in the loan document. Jacob did not disclose the loan from Tina in his financial affidavit.

¶ 32    Jacob testified concerning his jobs with the Elmhurst Police Department, the Aurora Police Department, as a limousine driver, and negotiations to work for Tina. Jacob testified that he left the Elmhurst Police Department in July 2021, with Caitlin's agreement, to pursue his dream of becoming a teacher and football coach. He did not take classes in furtherance of those goals. Instead, in October 2021, he began working for the Aurora Police Department, which he quit in February 2022. He denied that the Aurora Police Department asked him to resign because he had committed bigamy. He then began working as a limousine driver for an acquaintance of Tina's. He testified that he was paid $3000 twice per month. He also testified that he was paid $3000 once

9

per month, and his financial affidavit represented the same. Since obtaining the job as a limousine driver, he has not looked for additional or different employment.

¶ 33　　　　Elsewhere, Jacob explained his departure from the Elmhurst Police Department differently. He maintained that he left the Elmhurst Police Department in July 2021, but he stated that he left because he was exploring employment with Tina. He engaged in lengthy negotiations with Tina, of which Caitlin was made aware. During this time, Tina transferred $225,000 in funds to a BMO Harris account jointly held by Tina, Jacob, and Caitlin. In October 2021, Jacob decided against employment with Tina, reasoning that working for Tina would keep him from his family. Therefore, Jacob began working with the Aurora Police Department, and Tina removed approximately $170,000 in funds from the BMO account. While Jacob denied ever working for Tina, he acknowledged that in his deposition he had pled the fifth amendment when asked whether he ever worked for Tina.

¶ 34　　　　In the course of explaining his separation from Caitlin, Jacob implied that he left the Elmhurst Police Department in October 2021. He testified that he separated from Caitlin in October 2021, believing she was having an affair with a fellow officer, and that this informed his decision to leave the Elmhurst Police Department.

¶ 35　　　　Contrary to Caitlin's testimony, Jacob denied ever being provided with a personal assistant while in a relationship with Tina. He "c[ould] not recall" whether he had offered Caitlin $150,000 cash one month before trial and denied having access to $150,000 cash. The June 23, 2021, check for $225,000, to which Caitlin testified, had never been deposited or cashed.

¶ 36　　　　　　　　　　　　　　　C. The Trial Court's Judgment

¶ 37　　　　On December 26, 2023, the trial court entered the appealed-from judgment of dissolution, resolving many of the issues litigated at trial. We set forth the relevant portions of the written

10

judgment and oral ruling.  Preliminarily, we note that the trial court stressed its view of the parties' credibility throughout its ruling with statements such as: "[N]ot only was [Jacob's testimony] not credible and certainly at times evasive, and also I took into consideration inferences of him taking his fifth amendment right, but I also found that he was impeached numerous times at the time of trial through his examination. I did find that [Caitlin] was a credible witness."

¶ 38        The written judgment incorporated a September 2023, court-approved parenting allocation. The parenting allocation gave Jacob parenting time with the two older children every other weekend and every other Wednesday night.  The older children stayed with Caitlin the remaining 10.5 days in each 14-day cycle.  The youngest child stayed with Caitlin 14 of 14 nights, with a different schedule to be decided as she grew older.

¶ 39        The judgment provided as to dissipation: "Caitlin has made a claim of dissipation in the amount of $174,406.89. Caitlin credibly testified that none of the charges were for her benefit, aside from the Guardian fees. Jacob also made payments with marital monies towards his credit cards. The Court finds that Caitlin has made a *prima facie* case of dissipation, therefore, the burden has shifted to Jacob. Jacob offered limited testimony on the dissipation claim and did not provide an itemized response to Caitlin's claim. Jacob only testified regarding $24,324.46. His failure to respond to the above constitutes a legal admission for dissipation. As such, the Court finds Jacob dissipated $150,082.43 in marital funds."

¶ 40        The trial court accounted for Jacob's dissipation by awarding the marital residence to Caitlin.  The written judgment provided: "Within Jacob's Financial Affidavit he values the house at $350,000. Caitlin offered an appraisal of the house at $375,000, but testified she would accept the value at $350,000. The property is found to be worth $350,000. A mortgage exists of

11

approximately $221,105.37 resulting in equity of $128,894.63. As an offset for the dissipation, Caitlin is assigned the [marital residence] as her sole and separate property."

¶ 41    In addition to the remaining mortgage debt, the trial court ordered Caitlin responsible for her outstanding credit card debt of $13,945. The court ordered Jacob responsible for his outstanding credit card debt of $29,158. It also ordered that Jacob be responsible for the FinWise loan, the Achieve loan, and the personal loan from Tina. It noted that Jacob had not disclosed the FinWise loan or the person loan from Tina on his financial affidavit.

¶ 42    The trial court accounted for retirement account transactions, which were separate from Caitlin's dissipation claim, as follows. "Retirement accounts. Jacob testified on cross examination he holds a Schwab IRA, resulting from a claimed unilateral 'rollover' from his Elmhurst pension. Jacob testified the account had $59,000 but offered no exhibits or documents confirming the values of the Charles Schwab Account. The Court notes that Jacob's Financial Affidavit lists the value of the pension at $84,000. It remains unclear why the Schwab Account is at $59,000 as Jacob testified. Jacob also held a deferred compensation plan during the pendency of the divorce, and chose to unilaterally deplete the account without leave of court or notifying Caitlin in March of 2023. To account for the above, Caitlin shall be awarded the entirety of the Schwab IRA."

¶ 43    The trial court ordered that Jacob pay monthly child support in the amount of $1498 and monthly maintenance in the amount of $1582 for a term of four years and seven months. In reaching these figures, the court set Caitlin's income at just under $20,000, her current salary working part-time as a nurse. The court set Jacob's income at $106,000, his 2019 salary at the Elmhurst Police Department. Orally, the court noted the difficulty in determining Jacob's income. Some of the evidence suggested that he earned $36,000 per year as a limousine driver. This was not the entire picture, however, as Jacob also appeared to be living a luxurious lifestyle. The court

considered and rejected Jacob's argument that his luxurious lifestyle was due to only Tina's resources. Nevertheless, the court declined to base its imputation of income on the extravagant expenditures, explaining that those circumstances supported its property distribution and dissipation findings. In balance, the court determined that the salary which had the strongest support in the record for the purpose of imputed income was Jacob's past salary as an Elmhurst Police Officer. To the extent Jacob would have difficulty securing another job as a police officer, that difficulty was due to Jacob's own decisions and actions and was not a basis for imputing a lower income amount.

¶ 44       Finally, the court noted that, on August 23, 2023, Caitlin had filed a petition for interim and prospective attorney fees. As of that date, Caitlin had incurred $71,853 in attorney fees. Additional fees were generated during the trial. The court denied the petition but expressed reluctance:

> "I would certainly be considering some fees for [Caitlin], but *** there's really no place to get them from[.]
>
> When I take a look at what's happened on the value of the home, *** the retirement account ***, the debts that I've assigned to each party, I simply can't find any [assets] *** that are available to pay [Caitlin's] fees or at least contribute to her fees, so I'm left with virtually little or no alternative."

This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46       On appeal, Jacob challenges the distribution of marital property, the dissipation finding, and the imputation of income. As we explain, the issues are closely linked. Jacob's challenge to the distribution of marital property primarily concerns the award of the marital residence to Caitlin

13

and the assignment of debt to Jacob from the FinWise loan, the Achieve loan, and the loan from Tina. The court awarded the marital residence to Caitlin, in part because it found that Jacob had dissipated marital assets. As Caitlin stated in her brief, "[r]ather than order Jacob to reimburse the marital estate for the [$150,000] dissipation, or otherwise reimburse Caitlin directly for one-half of the dissipated amount, the trial court ordered that the marital home be solely allocated to Caitlin." The court's dissipation finding is subsumed by its subsequent decision to award the marital residence to Caitlin. Moreover, Jacob never addresses the evidentiary shortcomings surrounding the alleged loan from Tina, and he agrees that his challenge to the assignment of debt from the FinWise and Achieve loans is an indirect challenge to the court's decision to impute income to Jacob, an argument that we ultimately reject.

¶ 47       We review a trial court's dissipation ruling under the manifest-weight-of-the-evidence standard of review and its ultimate division of marital property according to the abuse-of-discretion standard of review. *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 699-700 (2006). The trial court's decision to impute income for purposes of child support and maintenance is reviewed under the abuse-of-discretion standard of review. *In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶¶ 42-43. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the court's findings are unreasonable, arbitrary, or not based on the evidence. *Id.* ¶ 32. The court abuses its discretion where its decision is not based on the evidence or where no reasonable person would take its view. *Id.* ¶ 44; *In re Marriage of Los*, 136 Ill. App. 3d 26, 30 (1985).

¶ 48                          A. Distribution of Marital Property and Dissipation

¶ 49       Distribution of marital property is a matter within the discretion of the trial court. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34. The distribution of assets must be

14

equitable and need not be mathematically equal to be equitable. *Id.* It is normally preferred to award the marital home to the custodial parent. *Id.* ¶ 44.

¶ 50   Jacob challenges the trial court's distribution of marital property, claiming that it "awarded Caitlin approximately 90% [footnote] of the marital assets by awarding her $187,894 in equity/cash as personal property and approximately $192,143 in liabilities while only awarding Jacob approximately $13,945 in liabilities." This assertion is perplexing. Comparing it to the trial court's written judgment, it appears that Jacob refers to: (1) Caitlin's $187,894 equity award (approximately $128,000 equity in the marital residence plus approximately $59,000 in the Schwab account); (2) *Jacob's* $192,143 in liabilities ($50,000 FinWise loan + $37,985 Achieve loan + $75,000 from Tina + $29,158 in personal credit card liabilities); and *Caitlin's* $13,945 in personal credit card liabilities. Jacob acknowledges in a footnote, without any apparent irony, that the claimed 90% figure "is an approximation to account for the value of the deferred compensation plan Jacob unilaterally depleted, whose value was not offered or stipulated by either counsel." Jacob does *not* acknowledge that he offered no exhibits or documents confirming the value of the Schwab account, only disclosing its existence one hour before trial. More critically, Jacob omits the trial court's assignment of $221,000 mortgage debt to Caitlin and, as we will explain, mischaracterizes the claimed $162,986 in liabilities to Jacob pertaining to the FinWise, Achieve, and personal loans. Thus, the trial court's distribution is not nearly so disparate as Jacob contends even before *any* finding of dissipation. We nevertheless address Jacob's dissipation argument, which is central to his appeal.

¶ 51   When dividing marital property, the trial court is required to consider the factors listed in section 503(d) of the Act, including dissipation. 750 ILCS 5/503(d)(2) (West 2022). For the court to consider a dissipation claim, the party alleging dissipation must file a notice of intent to claim

dissipation that comports with statutory requirements. *Id*. The statute requires that the notice contain a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred. *Id*. § 503(d)(2)(ii).

¶ 52        Dissipation is "the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown." (Internal quotation marks omitted.) *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 86. The party alleging dissipation must first make a *prima facie* showing that dissipation has occurred. *Hamilton*, 2019 IL App (5th) 170295, ¶ 78. A *prima facie* case is "a party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." (Internal quotation marks omitted.) *People v. Howard*, 2022 IL App (3d) 210134, ¶ 14. Specifically, *prima facie* means "at first sight, on the first appearance; on the face of it, so far as can be judged from the first disclosure; presumably; a fact presumed to be true unless disproved by some evidence to the contrary." (Internal quotation marks omitted.) *Id*. Once the party alleging dissipation has made a *prima facie* showing, the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent. *Hamilton*, 2019 IL App (5th) 170295, ¶ 78. "Vague and general testimony that marital assets were used for marital expenses is inadequate to meet the spouse's burden to show by clear and specific evidence how funds were spent." *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 69. If the party charged with dissipation cannot refute the dissipation claim by clear and specific evidence, the court will find dissipation. *Id*.

¶ 53        Jacob argues that Caitlin failed to make a *prima facie* case of dissipation. First, he argues that Caitlin did not make a *prima facie* showing that the charges on the American Express

16

Centurion Black Card statements set forth in Exhibit A reflected his expenses at all, and, even if they did, Caitlin did not make a *prima facie* showing that Jacob paid those expenses. If Caitlin failed to make a *prima facie* showing as to the American Express Centurion Black Card statements, the dissipation finding would be reduced by approximately $126,000. The dissent agrees with Jacob on this first point. Second, Jacob argues that Caitlin failed to make a *prima facie* showing that the marriage began to irretrievably break down in August 2021 as opposed to October 2021. If Caitlin failed to make a *prima facie* showing that the marriage began to irretrievably break down in August 2021, then the dissipation finding would be reduced by approximately $52,000.

¶ 54     In support of his first argument, Jacob relies upon an unpublished case, *In re Marriage of Yvanauskas*, 2022 IL App (3d) 200474-U, ¶ 27, for the proposition that a self-made chart is insufficient to make a *prima facie* dissipation claim. The instant case is distinguishable, however, as Caitlin introduced more than Exhibit A. Caitlin's attorney represented to the court that the American Express Centurion Black Card statements were provided by American Express in response to a subpoena requesting statements for accounts held by Jacob or for which Jacob was an authorized user. Contrary to Jacob's position, his name does appear on several of the partially redacted statements. As Jacob notes, many of the charges were redacted. However, many of the charges were *not* redacted. While it is not our role to scour the record, this court was able to find and view 46 of the 48 Centurion charges set forth in Exhibit A. Correspondingly, Jacob does not indicate which charges set forth in Exhibit A, if any, were redacted. Further, there were many visible charges on the statements that Caitlin chose not to include in Exhibit A. For example, the statements showed $458 in charges for Jacob's June 28, 2022, Boston to Detroit airline ticket and $458 in charges for Tina's June 28, 2022, Boston to Detroit airline ticket. However, Caitlin included only the charges for Jacob's ticket on Exhibit A.

17

¶ 55       The evidence showed that both Jacob and Tina made payments toward the American Express cards' balances. As Jacob agrees in his reply brief, the American Express subpoena response shows that, between April 2022 and January 2023, payments were made by a "maker" Jacob Beltran, some from a mobile pay account, in the amount of approximately $26,000, for a credit card ending in x2003. Though not mentioned by the parties, the subpoena response also shows that, between July 2021 and March 2022, payments were made by a "maker" Jacob Beltran, from a mobile account, in the amount of approximately $52,000, for a credit card with a redacted number. Regardless of who paid the charges, many of the purchased items were clearly for Jacob's benefit. Charges in the amount of $24,219 were to Harley Davidson. Charges in the amount of $12,000 reflected tickets to the Super Bowl that Jacob acknowledged attending. The evidence, such as the June 2021 commitment letter, supported that Jacob would be given gifts in lieu of income. For these reasons, Caitlin presented *prima facie* evidence that the Centurion charges listed on Exhibit A were incurred for Jacob's benefit and constituted dissipation of the marital estate.

¶ 56       Jacob appears to argue that a *prima facie* dissipation case must be based on evidence of a depleted account as opposed to expenses incurred. While a *prima facie* dissipation claim is often based on a depleted account, see, *e.g.*, *Hamilton*, 2019 IL App (5th) 170295, ¶ 80 ("in many cases, the *prima facie* evidence of dissipation consists of large withdrawals of cash from the parties' bank accounts *** [but] that is just one of the ways to make a *prima facie* case of dissipation), courts have allowed dissipation claims based on an unexplained mismatch between income and expenses. See, *e.g.*, *Hubbs*, 363 Ill. App. 3d at 700-01 (holding that the wife made a *prima facie* showing of her $41,000 dissipation claim where she showed that the husband's income was $41,000 more than his stated expenses, leaving the remaining missing funds unexplained). Indeed, courts recognize that dissipation claims, by their nature, may involve illusory transfers and facts that

18

remain hidden well into discovery and through trial. See, *e.g.*, *Hamilton*, 2019 IL App (5th) 170295, ¶ 76. That is why, after Caitlin made a *prima facie* showing, it was Jacob who was required to explain the credit card transactions with clear and specific evidence. Here, the trial court reasonably determined that Jacob failed to do so, given Jacob's evasive and inconsistent explanations.

¶ 57        Considering the dissent's position that Caitlin failed to link the credit card expenditures to the marital estate, we initially note that the highly unique fact pattern here does not closely align with the published cases discussed by the dissent, wherein the appellate courts deferred to the trial courts' credibility determinations (*In re Marriage of Manker*, 375 Ill. App. 3d 465 (2007)) or otherwise *affirmed* findings of no dissipation (*In re Marriage of Budorick*, 2020 IL App (1st) 190994). Caitlin did not present her dissipation claim in a vacuum but in the context of a larger dissolution case.

¶ 58        Caitlin, who the trial court credited, testified and set forth evidence that Jacob received a job offer from, and worked for, Tina. Caitlin visited Jacob while he was working for Tina. Caitlin's testimony is corroborated by the commitment letter, *as well as* the yet unsigned employment contract (which was all Caitlin had access to) setting forth a $225,000 salary; the undisputed and remarkable circumstance that Jacob contemporaneously quit a job with a six-figure salary and benefits that he had held throughout the marriage; Tina's contemporaneous transfer of funds totaling $225,000 into an account jointly held by Jacob, Caitlin, and Tina; and Tina's contemporaneous gifts (including a Black Card with Jacob's name on it and a motorcycle, per Jacob's texts). Less than two weeks prior to Jacob's announcement that he was leaving Caitlin *for Tina*, Tina withdrew $170,000 from the joint account. Tina defied a subpoena to testify. The trial court credited testimony and evidence that, despite the withdrawal, Jacob continued to live a life

of luxury—traveling the world and enjoying expensive goods. Caitlin submitted evidence of these expenditures in the form of credit card statements for cards that Jacob owned or for which he was an authorized user. Caitlin's testimony and evidence is juxtaposed by Jacob's evasion, inconsistent testimony, and, relevant to Jacob's overall lack of credibility, additional undisclosed assets and transfers. While the trial court may not have expressly connected each dot, *i.e.*, by specifically mentioning the commitment letter, its overall acceptance of Caitlin's testimony supports its conclusion that Caitlin set forth *prima facie* evidence linking the credit card expenditures to the marital estate.

¶ 59 Next, Jacob argues that Caitlin failed to establish a *prima facie* case that the marriage began to irretrievably break down in August 2021. The court calculates dissipation from the time the marriage begins to undergo an irretrievable breakdown, not from the time the breakdown is complete. *Id*. ¶ 86. If the record does not contain evidence showing when the marriage began to irretrievably breakdown, then the breakdown should be measured from the time the parties separated or filed a dissolution petition. *Id*.

¶ 60 Not every conflict marks the point of irretrievable breakdown. *Romano*, 2012 IL App (2d) 091339, ¶ 91. On the one hand, initial signs of trouble followed by attempts to reconcile are typically insufficient to establish the starting point of the irretrievable breakdown. *In re Marriage of Hazel*, 219 Ill. App. 3d 920, 922 (1991). Facts that may support the beginning of an irretrievable breakdown include the cessation of a sexual relationship; keeping finances at arm's length; declining to share childrearing responsibilities; and declining to share meals. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 376-77 (2008). In sum, the date of irretrievable breakdown is the date by which it is apparent that a breakdown is inevitable. *Hazel*, 219 Ill. App. 3d at 922.

¶ 61     In this case, the parties appear to agree that the breakdown was *complete* as of October 16, 2021, the date on which Jacob told Caitlin that he would not be returning to the marital residence and would instead live with Tina. However, in her notice of intent to claim dissipation, Caitlin set forth October 16, 2021, as the date on which the breakdown *began*. In her trial testimony, Caitlin acknowledged that she set the start date of October 16, 2021, in her notice. She explained, however, that October 16, 2021, was the date she learned that Jacob was having an affair. In hindsight, she believed the affair to have begun in May of 2021. In addition, the evidence supported that August 2021 would have been the first month that Jacob no longer worked for the Elmhurst Police Department and when he became financially entangled with Tina without disclosing the full nature of that relationship to Caitlin. The trial court reasonably determined that Jacob failed to clearly and specifically explain whether the nature of that indisputable financial entanglement was employment based (indicating that the funds and expenditures were marital property), or romantic (signifying the beginning of the irretrievable breakdown), or both.

¶ 62     The case law is clear that an irretrievable breakdown may begin prior to the date of separation. *Holthaus*, 387 Ill. App. 3d at 376-77. It is reasonable for a trial court to look to the existence of an extramarital affair, with no intervening attempt to reconcile, as the beginning of the irretrievable breakdown. The existence of an extramarital affair is similar in character to the events and circumstances marking the beginning of an irretrievable breakdown set forth in other cases, such as the cessation of a sexual relationship. See *id*. What is different about the instant case is that only one spouse, Jacob, initially knew about the circumstance that, inevitably, led to the irretrievable breakdown. This difference is not fatal, particularly in the context of establishing a *prima facie* case. There is no evidence that there *would* have been an attempt at reconciliation,

where Jacob simply announced that he was leaving and, shortly thereafter, bigamously married Tina.

¶ 63      Despite Caitlin's notice setting forth an "irretrievable breakdown" date of October 16, 2021, Caitlin's notice made clear through her attachment of Exhibit A that she would be seeking dissipation from August 2021.  It is reasonable to infer that the discrepancy, somewhat clarified through Caitlin's testimony, is due to the difference between the beginning and the completion of the irretrievable breakdown.

¶ 64      However, even if Caitlin failed to set forth *prima facie* evidence that the irretrievable breakdown began in August 2021, the trial court's decision to award the marital residence to Caitlin was not an abuse of discretion.  Dissipation is but one factor considered when dividing marital property. *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 51. If dissipation is established, the circuit court may, but is not required, to charge the dissipating party. See *id*.

¶ 65      Here, the trial court made a dissipation finding of $150,000.  If the court had accepted Jacob's argument that it should not have considered expenses prior to October 16, 2021, the dissipated amount would have been $98,000.  However, as Caitlin agrees, the trial court never ordered Jacob to reimburse the marital estate in the amount of $150,000.  Instead, it relied upon the $150,000 dissipation amount as a basis to award the martial residence to Caitlin.  The marital residence had $128,000 in equity.  If the court had relied upon a $98,000 dissipation amount as a basis to award the marital residence to Caitlin, the difference between dissipation amount and the equity in the marital residence would have left $30,000 in equity to be divided.  Assuming, *arguendo*, that the court would have divided the equity in the marital residence equally, awarding the marital residence to Caitlin without splitting that equity would result in a $15,000 advantage to Caitlin.  However, this advantage only pertains to the equity in the residence.  As set forth

22

upfront, the remaining mortgage debt with which Caitlin is charged places her in a more challenging financial position.

¶ 66       Regardless, any slight advantage to Caitlin is not a basis to remand for reconsideration of the allocation of the marital residence. The trial court noted that the marital estate had almost no liquidity. It strongly indicated that, if Jacob had any liquid assets, it would have granted Caitlin's petition for attorney fees, up to $70,000. To free $15,000 in equity, the court would have had to order a sale of the marital residence. This would mean that Caitlin and three children under age 12 would lose their family home, with Caitlin tasked to find another housing arrangement in the current market. See, *e.g.*, *Hamilton*, 2019 IL App (5th) 170295, ¶ 44 (courts favor awarding the marital residence to the custodial parent). The court indicated that it would turn around and order that same $15,000, less fees associated with selling the residence, to be applied toward Caitlin's attorney fees.

¶ 67       Jacob next argues that the trial court abused its discretion in ordering Jacob responsible for his own debts. As noted by the trial court, Jacob never disclosed the alleged personal loan from Tina to Jacob in his financial affidavit. The loan document was not signed and Jacob did not testify that he ever made the scheduled payments. Also, Jacob presents the FinWise loan and Achieve loan as two separate loans, but he testified that the Achieve loan subsumed the FinWise loan. As noted by the trial court, Jacob failed to disclose the FinWise loan on his financial affidavit. Finally, Jacob testified that he took out these latter two loans to meet his temporary support obligations, which had been based on Jacob's imputed income of $120,000. Jacob agrees in his brief that his objection to this debt allocation hinges on the underlying imputation. He does not directly challenge the $120,000 imputation but does challenge the subsequent $106,000 imputation. We reject that argument as set forth below.

¶ 68                                    B. Imputation of Income

¶ 69        Jacob next challenges the trial court's decision to impute an income of $106,000 for the purpose of determining child support and maintenance. When a party's income is difficult to ascertain, the court may order a party to pay support and maintenance at a level commensurate with his earning potential. *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009). For the court to impute income, it must find one of the following three factors to be present: (1) the payor is voluntarily unemployed or underemployed; (2) the payor is attempting to evade a support obligation; or (3) the payor unreasonably failed to take advantage of an employment opportunity. *Id*. If none of the three factors are in evidence, the court may not impute income, and it abuses its discretion in doing so. *Id*.

¶ 70        Here, the evidence supported that Jacob was voluntarily underemployed. He had previously earned over $100,000 annually working as a police officer. By his own testimony, he voluntarily resigned from that position and is presently working as a limousine driver earning $36,000 per year. He agreed that he has not looked for different employment. He has not pursued teaching and coaching, as he testified was his plan. He has not pursued another police officer position. Thus, the trial court did not abuse its discretion in deciding to impute income.

¶ 71        The next question is whether the evidence supports the $106,000 figure. According to Caitlin, Jacob negotiated for and obtained a *higher* salary working for Tina. The commitment letter shows an offer of income not to exceed $163,000 in *taxable* income and a brazen plan to make additional income difficult to document, noting that gifts would be provided. Jacob's subsequent actions, including the acceptance of large cash transfers and expensive gifts, such as high-end motorcycles and vacations, are consistent with that plan. The unsigned employment agreement sets forth a $225,000 salary and checks and funds transferred into the BMO Harris

24

account support that amount. A subsequent $170,000 transfer of funds out of the BMO Harris account roughly corresponds to the expenditures claimed by Caitlin in her dissipation claim. Whereas the trial court found these and other unexplained circumstances collectively sufficient to support Caitlin's mere *prima facie* case for dissipation, it found the higher figures too elusive for the purposes of imputing income and chose instead to impute the $106,000 amount. The evidence supported that Jacob had earned approximately this amount in his most recent three years as a police officer. The evidence supported the $106,000 amount.

¶ 72 Jacob's arguments to the contrary are not persuasive. Jacob acknowledges that a court may impute income consistent with past earnings. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 47. He notes, however, that the past earnings cannot be based on outdated data that no longer reflects prospective income. *Id*. He argues that there is no evidence that he could again work as a police officer. He characterizes the court's statement that he lost his employment as a police officer due to his own actions as an inappropriate moral judgment.

¶ 73 This argument is unavailing. First, *Liszka* is distinguishable because, in that case, the payor's past employment had been *involuntarily* terminated. *Id.* ¶ 49. Second, Jacob agreed at trial that he has *not* attempted to find employment that would provide greater income than his current position as a limousine driver. Whether this is because he is accessing greater funds through his financial arrangement with Tina, or whether it is because he seeks to evade his support obligation is not dispositive. Where Jacob voluntarily left a position that paid $106,000 per year and represents that he has accepted a position that pays $36,000 per year with no effort to earn more, the court reasonably imputed an income of $106,000 per year. We certainly cannot conclude that no reasonable person would take the view of the trial court.

¶ 74 In his reply brief, Jacob cites *Gosney* and argues that the court did not expressly "find" him to be voluntarily underemployed. *Gosney*, 394 Ill. App. 3d at 1077. We do not read *Gosney* to require the court to use the precise words, "I find this party to be voluntarily underemployed." The sum of the court's oral explanation demonstrates that it so found. In any case, *Gosney* calls for reversal based on the absence of *evidence* supporting voluntary underemployment, not based on the court's choice of wording. *Id.* (the payor spouse was not voluntarily underemployed where he was terminated from his initial employment and applied to numerous jobs in the same field before securing a position with a lower salary than he previously earned). We therefore reject Jacob's final argument.

¶ 75                              III. CONCLUSION

¶ 76 The judgment of the circuit court of Du Page County is affirmed.

¶ 77 Affirmed.

¶ 78 JUSTICE HETTEL, dissenting:

¶ 79 While I agree the circuit court properly imputed income to Jacob for the purposes of determining child support and maintenance, I dissent on the issue of dissipation. Specifically, I disagree with the majority's conclusion that Caitlin made a *prima facie* showing that Jacob used marital property, *i.e.*, marital assets, to pay for the charges on the American Express Centurion Black credit card.

¶ 80 Dissipation occurs "when one spouse *uses a marital asset* for his or her sole benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." (Emphasis added.) *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 36. The concept of dissipation is premised on waste, specifically the "diminution in the marital estate's value due to a spouse's actions." *Brown*, 2015 IL App (5th) 140062, ¶ 67.

26

¶ 81        To claim dissipation, a spouse must first make a preliminary, or *prima facie*, case by filing a notice of intent. *Hamilton*, 2019 IL App (5th) 170295, ¶¶ 76-78. Pursuant to section 503(d)(2) of the Act, the notice of intent "shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an *identification of the property dissipated*, and a date or period of time during which the dissipation occurred." (Emphasis added.) 750 ILCS 5/503(d)(2)(ii) (West 2022). Generally, *prima facie* evidence of dissipation consists of: (1) large withdrawals of marital funds from the parties' bank accounts; (2) losses to the marital estate that were caused by the mismanagement of marital assets over time; (3) cash withdrawals or the expenditure of marital funds that add up to a substantial amount over months or years; or (4) using marital funds for living expenses that were selfish, excessive, and improper. See *Hamilton*, 2019 IL App (5th) 170295, ¶¶ 81-84 (citing a collection of cases that describe what constitutes *prima facie* evidence of dissipation).

¶ 82        In this case, Caitlin failed to adequately identify the marital property dissipated as required under section 503(d)(2)(ii). In other words, she failed to establish that the Centurion Black account ending in x5005 was a credit card account owned by Jacob, thereby increasing their martial debt. The spouse alleging dissipation has the initial burden of establishing a *prima facie* case of dissipation, and, although that burden is low, the alleging party must at least meet the statutory requirements. Here, Caitlin failed to show that Jacob was the primary account holder (owner) on the Centurion Black credit card ending in x5005 in the notice of intent or at trial. Further, she failed to "identify the property dissipated" because she neglected to show, or even allege, that marital assets from the parties' joint bank accounts or other marital funds were used to make payments on the Centurion Black account. Allegations of dissipation must meet the basic elements of section 503(d)(2), which require some, albeit minimal, corroboration. See *Yvanauskas*, 2022 IL App (3d)

27

200474-U (circuit court's finding that wife failed to prove husband dissipated marital assets under section 503(d)(2) was appropriate where wife submitted self-made chart showing dissipation of a 401K account but failed to provide reliable evidence to corroborate its existence). Simply listing expenditures that a spouse made on random credit cards, without including the identification of marital property used to pay off those cards is inadequate.

¶ 83         *In re Marriage of Manker*, 375 Ill. App. 3d 465 (2007), and *In re Marriage of Budorick*, 2020 IL App (1st) 190994, closely align with our facts and are instructive. In *Manker*, the wife merely listed the amounts of the husband's ATM withdrawals in her motion claiming dissipation and argued it was the husband's burden to prove how the funds were spent. The circuit court found that it was "more equitable to require a preliminary showing of dissipation before the burden shifts to the party charged with dissipation to refute the accusations" and concluded that the wife failed to present a *prima facie* case for dissipation. *Manker*, 375 Ill. App. 3d at 477. The appellate court affirmed, noting that the wife failed to support her dissipation claim beyond a list of routine ATM withdrawals, and, even if the wife had established a *prima facie* case, the evidence supported the circuit court's conclusion that the marital funds were used for legitimate living expenses. *Id.* Similarly, in *Budorick*, the appellate court held that the husband failed to set forth a *prima facie* case of dissipation where he simply claimed (in two notices of intent) that the wife withdrew funds from marital investment accounts but failed to "introduce account statements or other evidence in support of his claims of dissipation" and "made no attempt to tie [the] withdrawals to those he alleged in his notices of intent to claim dissipation." *Budorick*, 2020 IL App (1st) 190994, ¶ 91.

¶ 84         Likewise, here, Caitlin asserted that Jacob dissipated marital funds in her notice of intent to claim dissipation and attached a self-made chart listing various credit card expenditures from four different accounts in support of her claim—nothing more. Caitlin did not provide evidence of

28

corresponding payments from marital bank accounts or the use of marital assets to tie the expenditures to the misuse of marital funds. Thus, she failed to present a *prima facie* case for dissipation.

¶ 85 Unlike the majority, I find little to distinguish this case from our recent decision in *Yvanauskas*. In that case, we held that the use of a self-made chart was insufficient to establish a *prima facie* dissipation claim. *Yvanauskas*, 2022 IL App (3d) 200474-U, ¶ 26. The majority claims that this case is distinguishable because Caitlin introduced more than Exhibit A—she produced the Centurion Black credit card statements. Contrary to the majority's suggestion, however, those redacted statements are insufficient to draw a connection between the expenditures on the Centurion Black card and the marital estate. See 750 ILCS 5/503(d)(2)(ii) (West 2022) (notice of intent to claim dissipation must identify the marital property dissipated). Careful consideration of the redacted American Express statements leaves no doubt that Jacob was not the primary account holder on that card. Further and perhaps more telling, although the redacted American Express statements clearly show that Jacob made $27,927.38 in payments, they also clearly reveal that those payments were not made toward the balance on the Centurion Black card ending in x5005. In fact, the final page of the redacted American Express statements provides that Jacob made those credit card payments on an account ending in x2003, *not* x5005. This is hardly enough evidence to allow the trier of fact to presume that Jacob used marital assets to pay for the expenses on the Centurion Black account. See *Howard*, 2022 IL App (3d) 210134, ¶ 14 (*prima facie* threshold requires enough evidence to allow the trier of fact to infer the fact at issue).

¶ 86 The majority seems to imply that the expenditures on the Centurion Black credit card should be equated to marital funds because they represented a portion of Jacob's income, relying on a screenshot of a hand-written "commitment letter" allegedly signed by Tina that Caitlin

29

presented at trial. I find no basis on which to consider this document as evidence of an employment contract between Jacob and Tina. See *Ory v. City of Naperville*, 2023 IL App (3d) 220105, ¶ 19 (without proper authentication, the proponent of evidence has not provided a proper foundation and the document cannot be admitted into evidence). Nor is there any indication in the record that the circuit court used this letter as corroborating evidence of Jacob's income. Most important, the letter does not mention use of the Centurion Black credit card as an incentive or bonus in the terms of Jacob's employment.

¶ 87    I would therefore find that Caitlin failed to establish a *prima facie* case of dissipation for the expenditures on the Centurion Black credit card in the amount of $127,658.18 (total expenditures on the card from August 18, 2021, to July 28, 2022, as listed on Exhibit A). I would reverse the court's judgment as to dissipation and remand for the circuit court to recalculate the equitable distribution of marital property accordingly.